**STATE OF HAWAII**, Plaintiff–Appellee, v. **WILLIAM BATSON**, also known as Amos Cruse II, Defendant–Appellant

NO. 15509

(CR. NO. 88–0281)

JUNE 4, 1992

LUM, C.J., WAKATSUKI, MOON,
KLEIN, AND LEVINSON, JJ.

238

OPINION OF THE COURT BY LEVINSON, J.

The defendant–appellant, William Batson (Batson), also known as Amos Cruse II, appeals his second conviction [1] of the

---

[1] This court reversed Batson's first conviction due to constitutional defects in the jury selection process. *See State v. Batson*, 71 Haw. 300, 788 P.2d 841 (1990).

murder of his eleven–year–old son, Amos Cruse III (Amos), in violation of HRS § 707–701.5 (1986).[2] The conviction in the present appeal was by way of jury–waived trial. On appeal, Batson urges that portions of two of the trial court's findings of fact were clearly erroneous and that there was insufficient evidence to sustain the judgment of conviction as to second degree murder.[3] We disagree and affirm.

## I.

For a complete understanding of the issues presented, they must be placed in the context of the factual record. It is therefore necessary to set out the facts in some detail.

Amos was born on March 15, 1976, in Portland, Oregon, to Batson and his girlfriend, Mary Ann Seitz (Seitz). Batson and Seitz never married. Seitz, who retained legal custody of Amos, raised Amos in Portland without Batson. Batson had minimal personal contact with Amos until he flew from Hawaii to Portland; there he found the boy and transported Amos to Honolulu without Seitz's permission in late April or early May 1987. Thereafter,

---

[2] HRS § 707–701.5(1) (1986) provides:

> (1) Except as provided in section 707–701 [relating to murder in the first degree], a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person.

[3] Batson's theory of the case was that he recklessly caused Amos's death, thereby committing the offense of manslaughter, in violation of HRS § 707–702(1)(a). In arguing his motion for judgment of acquittal following the close of the prosecution's case–in–chief, defense counsel conceded that the evidence was "certainly consistent . . . with a reckless killing." *See* the May 7, 1991 transcript of proceedings (5/7/91 Tr.) at 6. In closing argument, defense counsel advised the trial court that "I'm not standing before you and [suggesting that] . . . this defendant should not be unaccountable [sic] of [sic] what he has done. There is a law he violated which he is guilty of. . . . The death of the defendant's son in this case, Your Honor, was the result of reckless[ness]." *See* 5/7/91 Tr. at 86–87.

Amos lived with Batson and his current girlfriend, Kathryn Morales (Morales), until he died.

Upon arrival in Honolulu, Amos was in apparent "fine" health and exhibited no injuries or bruises. He had no difficulty speaking or walking, although he tended to do the latter slowly and clumsily. Amos was approximately five feet tall and weighed about 100 pounds. He was slim, but a "hearty" eater.

·From approximately May 1 to June 23 or 24,[4] Amos resided with Batson and Morales at the Hawaiian Monarch Hotel (hotel). Shortly after Amos's arrival in Honolulu, Batson observed what he regarded as behavior problems in Amos, consisting primarily of persistent bed wetting and failure to complete assigned chores and homework. (Batson had obtained some study materials for Amos instead of enrolling him in school; because Batson had taken Amos without Seitz's permission, he did not want to be questioned by the authorities.) These problems frustrated Batson; he began to "discipline" Amos because of the bed wetting, nonperformance, and what was believed to be periodic lying.

Both Batson and Morales attempted to "talk" to Amos about his deficiencies. When "talking" did not yield the desired results, Batson became frustrated, angry, and violent, and began to beat Amos, sometimes severely, in Amos's ribs and stomach with his boot, his fists, his open hand, or whatever happened to be in his hand or was available. Morales personally observed Batson strike Amos on multiple occasions with his hand or closed fist, a belt, or a cowboy boot. Sometimes while he was being beaten, Amos was able to remain standing, and at other times he fell down. Batson would tell Amos to get up, and when Amos did so, Batson would hit him again. On one occasion, Amos asked Batson to stop the beating and promised to be "good."

---

[4] All further date references, unless otherwise indicated, are to the year 1987.

Batson testified that after the first beating Amos manifested no reaction. A few days later, however, Amos appeared to be in pain, was awkward and slow in moving, and "favored" the upper portion of one side. Batson admitted thinking that there was something wrong with Amos's rib area and upper body. Batson further admitted that he continued to hit Amos for bed wetting with his fist and belt, but that he altered the locations of the beatings on Amos's body.

In mid–May, Batson administered Amos a particularly severe beating because Amos had wet his bed again, striking Amos with his boot in the stomach, ribs, and chest. Following the beating, Amos displayed difficulty in walking, stiff legs, lack of balance, and an apparent problem with his stomach. It was obvious to Morales that Amos was injured and in pain.

As a result of the beatings, Morales observed a cut on the top of Amos's head (which remained visible until his death), a split lip, bruised ribs, and a lump on his chest. When Morales inquired as to the cause, Batson told her that Amos had wet the bed again and had lied about it, resulting in Batson losing his temper and beating Amos. By this time, Amos was demonstrably sick, could not walk well, was unsteady and wobbly when he stood, seldom spoke, and only nodded or shook his head when being addressed. Batson admitted that Amos had received the scalp laceration because Batson had punched Amos in the face, causing Amos to fall and strike his head against a cabinet.

Amos was also placed in the bathtub as "discipline" for his bed wetting and to keep him close to the toilet. Batson would put Amos in the bathtub when friends came to visit. There also came a time when Batson ceased taking Amos out of the hotel room because of Amos's physical condition.

While still at the hotel, Morales asked Batson to take Amos to a doctor on at least three occasions, because she believed that Amos required treatment for the injuries sustained from Batson's

beatings. At first, Batson told Morales that he could not take Amos to a doctor because he was afraid that, if he did so, he would be charged with having kidnapped Amos. Later, Batson merely stated that Amos's condition was none of Morales's business and that he would take care of the situation.

Batson testified that at about this time, and in addition to the symptoms he had noticed earlier, Amos's appetite progressively deteriorated to the point where it disappeared completely.

Despite Batson's uncontroverted opportunity and financial ability to pay for treatment, he never sought medical assistance for Amos's condition. According to Batson, he did not obtain medical care for Amos because he was more worried about himself than he was for Amos, because he did not want to have to explain Amos's injuries, and because he believed he would be arrested for child abuse for having caused Amos's injuries. Batson admitted knowing that Amos was sick, very weak, and vomiting a lot.

On June 23 or 24, Batson, Morales, and Amos moved to a fourth floor apartment (apartment) in a building without elevators located at 2556 Lemon Road. At the time of the move, Amos was unable to climb stairs or to walk and lacked balance, so Morales had no alternative but to carry him over her shoulder up the four flights of stairs to the apartment.

The cut on Amos's head, the split lip, and the chest and rib injuries were not improving. Within a few days after the move, Amos appeared to lose his appetite, despite being offered food. Morales did not recall ever seeing Amos drink anything at the apartment. She again advised Batson that Amos needed to see a doctor because of his condition. Again Batson failed to take any corrective action.

While residing at the apartment, Morales witnessed Batson severely beating Amos on two separate occasions, because Amos had wet his bed and then lied about it. Once, Morales observed

Batson ask Amos to get up from where he was lying and get something, and Amos fell when he tried to do so.

Batson testified that, during this period of time, he hit Amos with his boot in the face and shoulder. He also punched Amos in the stomach, once so severely that the blow caused Amos to double over. Batson was aware that, because of their size differences, he could hurt Amos if he struck Amos forcibly, but that he nonetheless frequently punched Amos hard in the stomach with his hand and struck Amos in the stomach with his boot and belt.

Batson acknowledged that Amos ceased all eating three days before his death, was sick and weak, and was barely able to walk. Significantly, Batson admitted that *he was aware and specifically stated to Amos that Amos would die if he did not eat*; nevertheless, when Amos refused to eat, Batson would become angry and strike the boy with his boot, precisely because Amos would not eat. Batson testified generally that he was aware that Amos could barely move and had to be carried, that Amos had lost weight and was throwing up, and that Amos was bruised and in pain.

Just before Amos died, he was reduced to an emaciated state of 76 pounds, very thin for his height of five feet. By contrast, Batson was over six feet tall and weighed approximately 215 pounds.

On the evening of June 30, Amos was sent to the bathtub to sleep as "discipline" for wetting his bed. Batson testified that he could hear Amos groaning from the other room *and knew that Amos was in pain and needed a doctor*. Nevertheless, he neither checked Amos's condition nor sought medical attention for Amos, but rather went out drinking with a friend. Morales was also away from the apartment at the time, at work.

Sometime during the morning of July 1, Amos died from acute peritonitis. Batson later returned to the apartment. When Morales arrived home from work at approximately 5:00 a.m., Batson instructed her to check on Amos in the bathroom. Morales discovered Amos lying in the bathtub, naked, with his head down

and his eyes open. He was not breathing. Amos's chest was cold to the touch, and there was no air exhaling from his nose or mouth. Mucous or phlegm was exuding from Amos's mouth. Batson opined, for the first time, that Amos should be hospitalized, but Morales stated that it was too late and would do no good, because Amos was dead. Batson testified that he then realized that there was a "very strong possibility" that he had caused Amos's death.[5]

Batson returned to the bathroom twice on July 1. Morales went to work that evening, but returned home at about midnight when Batson called her on her beeper. Morales ate and then slept until 2:30 or 3:00 a.m., when Batson awakened her and instructed her to go with him to the car to take care of Amos.

Batson carried Amos to the car, wrapped in a sheet; he placed Amos in the back seat and drove to a road off the Pali Highway, where he and Morales abandoned Amos in the dirt.

Dr. Alvin Omori, the Medical Examiner for the City and County of Honolulu, viewed Amos's body at the scene where it was located and also conducted an autopsy. Externally, Dr. Omori observed facial bruises, a healing scrape on the scalp, two black eyes, cuts to the lips, a chipped tooth, and a scrape on the left hip inflicted before Amos died. Internally, he discovered multiple rib fractures and other left–side internal fractures due to trauma, two of which had occurred within days of death and eight of which were healing. Amos's brain had hemorrhaged due to trauma, and there was internal bleeding caused by a lacerated intestine. He determined that Amos's death was caused by acute peritonitis, an abdominal infection, resulting from a hole or tear in the upper intestine due to blunt trauma, probably two to seven days before death. The contents of Amos's intestine had leaked into the

---

[5] Batson later stated to an investigating police detective that he had made a mistake, that Amos would be alive if he had gotten medical attention, and that "a normal person would have taken Amos to the doctor."

abdominal cavity, causing the infection. The intestinal tear had preceded the rupture. It was Dr. Omori's firm opinions that the tear and the subsequent infection could only have been caused by a blow, that it would have been manifestly obvious to a lay person that Amos was a seriously ill child, and that there was no evidence that Amos had received any medical attention for any of his injuries.

Batson does not dispute that his repeated beatings of Amos were intentionally and knowingly administered. Batson further admits that he was the person who caused Amos's injuries.

## II.
## A.

Batson challenges "a number" of the trial court's findings of fact[6] upon which it based its conclusion and judgment of guilt as to second degree murder. Specifically, Batson suggests that "there was no evidence whatsoever" to support the trial court's finding that "[Batson] knew that [Amos] was in an extremely weakened physical state and was in need of extraordinary medical care . . . ." Batson also disputes the findings of his "complete knowledge . . . of [Amos's] condition which [he] had produced, [his] awareness that [Amos] suffered from internal injuries in light of the nature and extent of the beatings that [he] administered, [his] knowledge that [Amos] required medical care, [and his] awareness that without medical care [Amos] would die . . . ."

### 1.

We subscribe to the proposition that the trial court, as trier of fact, "may draw all reasonable and legitimate inferences and

---

[6] Actually, Batson only challenges certain findings contained in the trial court's Findings of Fact 17 and 19.

deductions from the evidence adduced, and findings of the trial court will not be disturbed unless clearly erroneous." *State v. Nelson*, 69 Haw. 461, 469, 748 P.2d 365, 370 (1987) (citations and ellipsis omitted). A finding of fact is not clearly erroneous "unless, after a review of the whole record, we are left with the definite and firm conviction that a mistake has been committed." (Citations and internal quotation marks omitted). *Id.*

Based on our review of the record as discussed above, we believe that there was ample evidence to support the challenged findings of fact. They were not clearly erroneous.

## 2.

Moreover, the record reflects that Batson invited the very findings of fact that he now attacks as erroneous. On June 18, 1991, Batson, through his attorney, filed proposed findings of fact and conclusions of law with the trial court. In paragraph seventeen, he proposed a finding, *inter alia*, that "[a]t the time of these beatings, Defendant knew that Decedent *was in an extremely weakened physical state and was in need of extraordinary medical care*, which Defendant intentionally and knowingly would not provide." (Emphasis added.) In paragraph nineteen, he proposed a finding, *inter alia*, acknowledging *"the complete knowledge by Defendant of Decedent's condition* which Defendant had produced, *Defendant's awareness that Decedent suffered from internal injuries* in light of the nature and extent of the beatings that Defendant administered, *Defendant's knowledge that Decedent required medical care*, [and] *Defendant's awareness that without medical care Decedent would die* ...." (Emphasis added.) The prosecution's proposed findings of fact and conclusions of law, filed on the same day, contained the identical language. The trial court's findings—that Batson now attacks—merely adopted the findings proposed by both parties.

In *State v. Bigelow*, 2 Haw. App. 654, 638 P.2d 873 (1982), the defendant complained that the judgment of conviction filed by the court contained no findings of fact as to the material elements of the offense of which he was convicted. The Hawaii Intermediate Court of Appeals (ICA) noted, however, that the defendant had requested no such findings, pursuant to Rule 23(c) of the Hawaii Rules of Penal Procedure (HRPP).[7] That being so, the ICA held that the trial court's general finding of guilt was sufficient. 2 Haw. App. at 654, 638 P.2d at 874.

Applying *Bigelow* by extension, we hold that a trial court's acquiescence in the making of a factual finding expressly requested by a defendant in a criminal case cannot thereafter form the basis of alleged error in the making of the same finding. To reach any other result would be to invite "appeal by ambush."

### B.

Batson next alleges that "[t]he trial court committed plain error in finding [him] guilty where there was insufficient evidence to sustain a guilty verdict as to murder in the second degree." We disagree.

The indictment against Batson read as follows:

> On or about May 1, 1987, to and including July 3, 1987, the exact dates being unknown, in the City and County of Honolulu, State of Hawaii, William Batson, also known as Amos Cruse II, being the parent, guardian or other person having legal or physical custody of Amos

---

[7] HRPP 23(c) provides:

> **(c) Trial Without a Jury.** In a case tried without a jury the court shall make a general finding and shall in addition, on request made at the time of the general finding, find such facts specially as are requested by the parties. Such special findings may be orally in open court or in writing at any time prior to sentence.

Cruse III, a person less than eighteen years of age, *did intentionally or knowingly cause the death of Amos Cruse III by striking Amos Cruse III and failing to seek and obtain medical treatment and attention for the injuries Amos Cruse III sustained, thereby committing the offense of murder in the second degree* in violation of Sections 707–701.5(1) and 706–656 [sic] of the Hawaii Revised Statutes.

The trial court's second conclusion of law tracked the language of the indictment, omitting reference to the statutory citations at the end. Batson challenges the sufficiency of the evidence to support the highlighted language.

We have long held that evidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction; the same standard applies whether the case was before a judge or a jury. *State v. Hirayasu*, 71 Haw. 587, 590, 801 P.2d 25, 26 (1990); *see also State v. Klattenhoff*, 71 Haw. 598, 607, 801 P.2d 548, 553 (1990); *State v. Pineda*, 70 Haw. 245, 250, 768 P.2d 239, 241–42 (1989); *State v. Halmos*, 70 Haw. 14, 16, 755 P.2d 1226, 1227 (1988). The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact. *Pineda*, 70 Haw. at 250, 768 P.2d at 242; *see also Klattenhoff*, 71 Haw. at 607, 801 P.2d at 553; *Hirayasu*, 71 Haw. at 590, 801 P.2d at 26; *Halmos*, 70 Haw. at 16, 755 P.2d at 1227. Indeed, even if it could be said in a bench trial that the conviction is against the weight of the evidence, as long as there is substantial evidence to support the requisite findings for conviction, the trial court will be affirmed. *Halmos*, 70 Haw. at 16, 755 P.2d at 1227.

"Substantial evidence" as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a man of reasonable caution to

support a conclusion. *State v. Lima*, 64 Haw. 470, 475, 643 P.2d 536, 539 (1982). And as trier of fact, the trial judge is free to make all reasonable and rational inferences under the facts in evidence, including circumstantial evidence. *Halmos*, 70 Haw. at 16, 755 P.2d at 1227.

1.

Batson correctly contends that the single–count indictment returned against him charges both murder by *commission* (i.e., "by striking" Amos) and by *omission* (i.e., by "failing to seek and obtain medical treatment and attention for the injuries [Amos] sustained"). From this observation Batson argues that because the indictment charges murder by commission and omission in the *conjunctive*, rather than in the *disjunctive*, "[t]he State was therefore obligated to prove both commission *and* omission in order to prove murder. (Emphasis in original.) Batson's syllogism either ignores or misconstrues controlling Hawaii case law.

In *State v. Lemalu*, 72 Haw. 130, 809 P.2d 442 (1991), the defendant (Lemalu) was charged with driving under the influence of intoxicating liquor (DUI) in a two–count complaint, alleging commission of the offense by alternative means. The jury acquitted him of count I (driving under the influence, in violation of HRS § 291–4(a)(1)), but convicted him of count II (driving with a blood alcohol level of 0.10 percent or more, in violation of HRS § 291–4(a)(2)). Lemalu appealed, asserting, *inter alia*, that the use of two counts to charge a single offense of DUI rendered the complaint defective, and that the trial court should have required the prosecution to elect only one count under which to proceed.

This court rejected Lemalu's argument and cited *State v. Jendrusch*, 58 Haw. 279, 283 n.4, 567 P.2d 1242, 1245 n.4 (1977), for the proposition that where a statute proscribes an offense that can be committed by factually alternative types of

conduct, "the charge may be laid [out] in the conjunctive but not in the disjunctive." *Lemalu*, 72 Haw. at 134, 809 P.2d at 444 (quotation marks omitted). The *Lemalu* court explained its ruling, 72 Haw. at 134, 809 P.2d at 444, on the basis that "[a] defendant must be put on sufficient notice of the nature and cause of the accusation with which he is charged. . . . Phrasing a complaint in the disjunctive would not provide such notice as it would leave the defendant uncertain as to which of the acts charged was being relied upon as the basis for the accusation against him." (Citations and internal quotation marks omitted.)

The two DUI counts were neither joined in the conjunctive nor the disjunctive; nevertheless, this court found that the complaint was impliedly set forth in the conjunctive and that it "sufficiently apprised Lemalu that he was charged with committing [an] offense . . . provable by two different means." 72 Haw. at 134, 809 P.2d at 445.

Accordingly, a defendant can be charged with having committed an offense in two different ways when he is alleged to have committed it in both ways. *See generally State v. Dow*, 72 Haw. 56, 806 P.2d 402 (1991); *see also State v. Cabral*, 8 Haw. App. 506, 510, 810 P.2d 672, 675, *aff'd*, 822 P.2d 957 (Haw. 1991). We agree with the ICA that "the most appropriate method to allege one offense committed in two different ways is to allege in one count that the defendant committed the offense (a) in one way 'and/or' (b) in a second way." *Cabral*, 8 Haw. App. at 511, 810 P.2d at 675–76.

However, combining the reasoning of *Lemalu* and *Cabral*, we hold that it is sufficient, as in the present case, that one offense allegedly committed in two different ways be charged *conjunctively* in a single count. If two alternative counts joined in the conjunctive are permissible, *see Lemalu*, and if joinder of alternative allegations in a single count by "and/or" is "appropriate," *see Cabral*, then a single count joining alternative means of commit-

ting an offense in the conjunctive is indistinguishably acceptable, the disjunctive "or" being subsumed within the conjunctive "and."

It therefore follows that, under the indictment in the present case, the prosecution was not required to prove separate and distinct cases of murder by commission and omission against Batson in order to establish guilt. Any combination of substantial evidence, legally sufficient to support the trial court's conclusion that Batson intentionally or knowingly caused Amos's death, would mandate affirming Batson's judgment of conviction.[8]

2.

As noted above, Batson does not dispute that he repeatedly beat Amos and that he did so intentionally and knowingly. Nor does he deny that he caused Amos's injuries and that he did not seek medical attention for them. And in urging a manslaughter

---

[8] The prosecution correctly argues that a plain reading of HRS § 707–701.5(1) (1986) reveals that Batson could be convicted of second degree murder based on proof that he intentionally or knowingly caused Amos's death by the *commission* of certain acts, i.e., by striking Amos.

Alternatively, Batson could be convicted upon proof that he intentionally or knowingly caused Amos's death by the *omission* of certain acts, i.e., by failing to seek and obtain medical treatment and attention for Amos's injuries. In this connection, HRS § 702–203 provides in pertinent part that "[p]enal liability may not be based on an omission *unaccompanied by action* unless: . . . (2) [a] duty to perform the omitted act is otherwise imposed by law." (Emphasis added.) Thus, by its plain language, HRS § 702–203 contemplates the possibility of penal liability based on an omission *accompanied* by, i.e., in combination with, action, as well as an omission *unaccompanied* by action.

It is significant that Batson neither disputes that he was Amos's parent and had physical custody of Amos at the time of Amos's death, nor that he was subject to a legal duty of parental support. *See* HRS § 577–7(a) (1985), imposing on parents, *inter alia*, a duty to "provide, to the best of their abilities, for the . . . support . . . of their children." Such support includes reasonably necessary and available medical services. *State v. Cabral*, 8 Haw. App. 506, 515, 810 P.2d 672, 677, *aff'd*, 822 P.2d 957 (Haw. 1991). *See also* HRS § 663–1.6(a) (1985), imposing on the perpetrator of a crime a duty to obtain necessary medical aid for the victim.

conviction before the trial court, he implicitly acknowledged that his conduct was the cause of Amos's death, i.e., that Amos's death was the result of his conduct. What Batson *does* claim is that the prosecution failed to prove that he acted intentionally or knowingly with respect to that result, and that therefore he could not be convicted of second degree murder.

The elements of an offense are such conduct, attendant circumstances, and results of conduct as are specified by the definition of the offense and negative any non–affirmative defenses other than statute of limitations, lack of venue, or lack of jurisdiction.[9] HRS § 702–205. A person acts *intentionally* with respect to a result of his conduct when it is his conscious object to cause such a result. HRS § 702–206(1)(c). A person acts *knowingly* with respect to a result of his conduct when he is aware that it is practically certain that his conduct will cause such a result. HRS § 702–206(2)(c).

The prosecution does not suggest that Batson intended to kill his son, that is, that it was his conscious object to cause Amos's death. Accordingly, the issue presented is whether there is substantial evidence on the record before us to support a conclusion that Batson acted knowingly—that he was aware that it was practically certain that his conduct by commission and omission would result in Amos's death.[10] We hold that there is.

The record before us paints a brutal and pitiful picture of two months of physical abuse, severe beatings intentionally and knowingly inflicted, an obviously injured child whose manifest and deteriorating condition was becoming increasingly grave, and a

---

[9] Batson's only defense at trial was that he acted recklessly with respect to the result—Amos's death—of his conduct.

[10] Interestingly, the common law did not distinguish between homicide by act and homicide by omission. *People v. Burden*, 72 Cal. App. 3d 603, 618, 140 Cal. Rptr. 282, 290–91 (1977).

conscious and deliberate unwillingness to seek and obtain medical treatment to deal with it, all combining to result in the child's death.

The law recognizes that "[t]he omission of a duty is . . . the equivalent of an act and when death results, the standard for determination of the degree of homicide is identical." *People v. Burden*, 72 Cal. App. 3d 603, 616, 140 Cal. Rptr. 282, 289 (1977).

A combination of individual acts of physical abuse and omissions to discharge parental duties and responsibilities, when coupled with the requisite state of mind, may rise to the level of murder. *See generally Cabral*, 8 Haw. App. 506, 810 P.2d 672, *aff'd*, 822 P.2d 957 (Haw. 1991);[11] *see also People v. Giddings*, 169 Mich. App. 631, 426 N.W.2d 732 (1988); *Zessman v. State*,

---

[11] In *Cabral*, the defendant (Clifford) was charged with the murder of his stepson, Michael. The facts, appearing in 8 Haw. App. at 508, 810 P.2d at 674, sufficiently resemble those in the present case that they bear setting out in full:

[O]n Saturday, August 2, 1986, Michael vomited his breakfast in the living room of the family residence. Clifford responded by striking Michael across the mouth, punching him in the stomach, and ordering him to his room. In the afternoon, when Michael emerged from his room and reported that he had again vomited, Clifford slapped and kicked Michael and then dragged him into the bathroom. From the direction of the bathroom, Michelle [Michael's mother] heard the sounds of water running, a stick hitting skin, and a thumping sound, as if someone had fallen in the bathtub. Later, Clifford repeatedly struck Michael across the mouth.

On Saturday evening, Sunday, and Monday Michelle fed Michael saimin (noodle) broth and liquids which Michael vomited soon after eating.

On Monday, Clifford twice prevented Michelle from taking Michael to the doctor. The first time he stated: "You're not going to go and pin this on me." The second time he stated that Michael was "just acting to get attention." On Tuesday evening, Clifford struck Michael's head and hands with a stick.

On Wednesday morning, Clifford and Michelle found Michael curled up on his bedroom floor, barely able to speak and complaining of a headache. Michelle took him to the [health center]. Within five minutes of his arrival,

94 Nev. 28, 573 P.2d 1174 (1978); *Burden*, 72 Cal. App. 3d 603, 140 Cal. Rptr. 282 (1977); *Harrington v. State*, 547 S.W.2d 616 (Tex. Crim. App. 1977). Given the difficulty of proving the requisite state of mind by direct evidence in criminal cases, "[w]e have consistently held that . . . proof by circumstantial evidence and reasonable inferences arising from circumstances surrounding the [defendant's conduct] is sufficient . . . . Thus, the mind of an alleged offender may be read from his acts, conduct and inferences fairly drawn from all the circumstances." *State v. Sadino*, 64 Haw. 427, 430, 642 P.2d 534, 536–37 (1982) (citations omitted); [12] *see also State v. Simpson*, 64 Haw. 363, 373 n.7, 641 P.2d 320, 326 n.7 (1982). This is particularly the case when the record establishes a continuing course of repeated and escalating episodes of violence, beatings, abuse, and neglect. *Hill v. State*, 445 N.E.2d 994, 996 (Ind. 1983); *State v. Powers*, 198 Mont. 289, 297, 645 P.2d 1357, 1362 (1982); *Zessman*, 94 Nev. at 33, 573 P.2d at 1178; *Harrington*, 547 S.W.2d at 619.

We hold that there is substantial evidence in the record before us in this case to support the trial court's conclusion that Batson knowingly caused Amos's death.

### III.

Because the trial court's challenged findings of fact were not clearly erroneous and because the trial court's conclusion that Bat-

---

Michael suffered cardiac arrest. Michael was immediately transferred to Kuakini Medical Center, where he was pronounced dead.

An autopsy revealed multiple bruises on Michael's body and traumatic injuries to his abdomen and head. Michael's body was both dehydrated and emaciated. His death was caused by the abdominal injuries and the subsequent absence of medical care and nurturing.

[12] As in the present case, Sadino argued that the prosecution had failed to prove the requisite state of mind for murder, but rather had only proved recklessness.

son knowingly caused Amos's death is supported by substantial evidence, the judgment of conviction is affirmed.

*William H. Jameson*, Deputy Public Defender, for defendant–appellant.

*Charlotte J. Duarte*, Deputy Prosecuting Attorney, for plaintiff–appellee.