**STATE OF HAWAIʻI**, Plaintiff–Appellee, v. **ELENA LOUISE TUCKER**, Defendant–Appellant, and **GLENN EDWARD TUCKER, SR.**, Defendant

NO. 15255[*]

(FC–CR. NO. 90–0010)

and

**STATE OF HAWAIʻI**, Plaintiff–Appellee, v. **GLENN EDWARD TUCKER, SR.**, Defendant–Appellant, and **ELENA LOUISE TUCKER**, Defendant

NO. 15264

(FC–CR. NO. 90–0010)

JUNE 10, 1993

BURNS, C.J., HEEN, AND WATANABE, JJ.

---

[*]*See also* supplemental opinion filed after certiorari at page 73.

44

## OPINION OF THE COURT BY WATANABE, J.

Following the death of their six–month–old son, Glenn Edward Tucker, Jr. (Baby Glenn), of massive head injuries, Elena Louise Tucker (Elena) and Glenn Edward Tucker, Sr. (Glenn), wife and husband (collectively, Defendants), were charged in separate cases with "intentionally or knowingly caus[ing] the death of [Baby Glenn] by voluntarily omitting to perform a duty imposed by law, thereby committing the offense of Murder in the Second Degree, in violation of Sections 707–701.5(1), 706–656 and 702–203(2) of the Hawai'i Revised Statutes." In response to a motion for a bill of particulars, the State subsequently clarified that the duty imposed by law charged in the complaint was the parental duty to provide timely medical care to a child. Following a consolidated jury trial, Defendants were convicted as charged and sentenced to life imprisonment, with mandatory minimum terms of imprisonment of fifteen years. Their separate appeals followed.

We conclude that the trial court reversibly erred when it failed to instruct the jury that Elena and Glenn must

have "intentionally or knowingly" caused the death of their son in order to be found guilty of murder. We also conclude that Elena's and Glenn's confrontational rights were violated when the trial court admitted into evidence the redacted confessions of Elena and Glenn, who did not testify at trial, each of which implicated the other spouse. In view of these errors, we vacate the judgments of the trial court and remand these cases to the trial court for proceedings consistent with this opinion.

## FACTS AND PROCEDURAL HISTORY

From November 1989 until February 1990, Defendants and their two children, Kaiwa and Baby Glenn, lived with Elena's grandmother, Mrs. Thelma Mercado, with whom Elena was very close.

In November 1989, the Hawai'i Department of Human Services, Child Protective Services Branch (CPS), became concerned that Baby Glenn was being overfed and not being provided with a clean home. Accordingly, CPS filed a petition in family court, which, in January 1990, entered an order of "family supervision" over the Tucker family. The court established a family service plan for Defendants and directed them, among other things, to make sure that Baby Glenn received proper medical treatment.

In February 1990, Elena's grandmother was placed in a nursing home, and the Tuckers were forced to move. They moved into the two–bedroom apartment unit of Lisa (Lisa) and George "Eddy" Major (George) (collectively, Majors), and were allowed to temporarily occupy the bedroom of the Majors' daughter, Elesha. The Tuckers and Majors were friends and had shared a house in the past.

48

On Tuesday, March 6, 1990, Elena told Glenn that she needed to leave for an appointment at the welfare office and that she wanted to take Baby Glenn to the doctor because he had a fever. Glenn told her that he was unable to drive her to her appointments because their car was inoperable and needed to be repaired.

As Elena was about to leave with Baby Glenn for her appointments, George and Glenn stopped her to check the baby's head for a fever. Believing that Baby Glenn did not have a fever, George suggested that Elena leave the baby at home, attend her welfare appointment, return home, and then take Baby Glenn to the doctor. Elena agreed and left Baby Glenn at home with George and Glenn. Shortly thereafter, Glenn left the apartment to attend a meeting in downtown Honolulu.

After Elena and Glenn had left the apartment, George noticed that Baby Glenn appeared tired, so he laid Baby Glenn on the couch and gave him a bottle of milk. George then returned to the kitchen to feed his daughter, Elesha, and Kaiwa Tucker. A few minutes later, George heard Baby Glenn choking and found that he had fallen off the couch onto the pillows on the floor and appeared to be having convulsions. Believing that the baby was choking, George grabbed the child and began stroking his back. However, when the baby continued to shake and his eyes appeared to be "fixed," George summoned help. 2/4/91 Transcript at 205. Eventually, Baby Glenn was transported to Pali Momi Medical Center, and then to Kapiolani Medical Center, where he was pronounced dead the next day. An autopsy revealed that death was caused by cranial cerebral injuries due to blunt trauma. The autopsy confirmed the presence of severe bruising of Baby Glenn's left scalp area and extensive fractures of the skull area

beneath, a swollen brain, hemorrhaging on the surface of the brain, and contusions and bruising on portions of the left face and on both thighs. According to the medical examiner who performed the autopsy, Baby Glenn's injuries were sustained anywhere from six hours up to four days prior to his death.

It was never determined who was actually responsible for the injuries that ultimately caused Baby Glenn's death. However, Defendants were charged with murdering him by omission of their parental duty to provide him with timely medical care, and were tried jointly.

At trial, neither Elena nor Glenn testified. However, prior to trial, each of them had given several self–incriminating statements to the police, which inculpated the other spouse. These statements were admitted into evidence, after they had been previously redacted[1] to eliminate any references made by Elena and Glenn which directly implicated the other spouse, and to replace other references to Elena or Glenn with the words "other person" or "another person." The trial court gave the jurors a limiting instruction, advising them that each of the statements was to be considered only to determine the guilt of the person giving the statement and not to determine the guilt of the codefendant spouse, and that if the words "other person" or "another person" were used in a statement, they were not to assume that the defendant giving the statement was referring to the other spouse.

After a trial in which several evidentiary rulings by the court were challenged by Defendants, the case was

---

[1] BLACK'S LAW DICTIONARY 1277 (6th ed. 1990) notes that "[i]n [a] broad sense, [the] term [redaction] refers to any revision or editing, but in a legal sense, it has come to indicate alteration of a confession to excise any reference by one joint defendant to any codefendant."

submitted to the jury. In instructing the jurors about the law which they should apply in deliberating the charges against Defendants, the trial court stated that a material element of the offense of murder in the second degree which had to be proved was that Baby Glenn's death was caused by Elena's or Glenn's intentional or knowing failure to perform their duty to provide their son with timely medical care. The trial court specifically refused to instruct the jury that "intentionally" or "knowingly" causing the death of Baby Glenn was an essential element of the offense. The trial court also gave the jury an accomplice liability instruction to which Elena objected.

On February 15, 1991, the jury returned verdicts against Elena and Glenn, finding each guilty of murder in the second degree. Following their sentencing, each filed a timely notice of appeal, both contending that the trial court committed reversible error by: (1) admitting into evidence the redacted confessions; and (2) failing to instruct the jury that in order to convict Defendants of murder in the second degree, it was required to find that Defendants intentionally or knowingly caused the death of Baby Glenn. Elena also maintains that the trial court erred when it: (1) gave the jury an improper instruction on accomplice liability; (2) failed to instruct the jury, *sua sponte*, that it had to consider the evidence separately and individually as to each defendant; (3) allowed testimony of Elena's prior involvement with CPS; (4) admitted testimony that Elena appeared unremorseful about Baby Glenn's critical condition; and (5) allowed the prosecutor to make an improper closing argument about its burden of proof. Glenn argues, additionally, that there was no substantial evidence to support the jury's guilty verdict against him.

## DISCUSSION

### I.

### The Requisite State of Mind for Conviction of Murder by Omission

We address, first, the trial court's jury instruction regarding the requisite state of mind for conviction of murder by omission, an issue resolved by the Hawai'i Supreme Court in *State v. Batson*, 73 Haw. 236, 831 P.2d 924 (1992).

Pursuant to Hawai'i Revised Statutes (HRS) § 707–701.5 (Supp. 1992), "a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person."

Defendants were charged by the State with committing murder in the second degree "by voluntarily omitting to perform a duty imposed by law," more specifically, by omitting to perform their parental duty to provide timely medical care to Baby Glenn.

Under HRS § 702–203 (1985):

Penal liability may not be based on an omission unaccompanied by action unless:

(1) The omission is expressly made a sufficient basis for penal liability by the law defining the offense; or

(2) A duty to perform the omitted act is otherwise imposed by law.

Pursuant to HRS § 702–204 (1985), moreover, "a person is not guilty of an offense unless he acted intentionally, knowingly, recklessly, or negligently, as the law specifies, with respect to each element of the offense." The elements

of an offense are "such (1) conduct, (2) attendant circumstances, and (3) results of conduct, as: (a) Are specified by the definition of the offense[.]" HRS § 702–205 (1985).

In instructing the jury about the offense of murder in the second degree, the trial court, over Defendants' objections, stated as follows:

> The defendants are charged with the offense of murder in the time [sic] second degree. A person commits the offense of murder in the second degree if he or she intentionally or knowingly causes the death of another person.
>
> There are three material elements for the offense of murder in the second degree, each of which the prosecution must prove beyond a reasonable doubt. These three elements are: One, that each of the defendants caused the death of their son, Glenn Edward Tucker, Junior. Two, that they did so by voluntarily failing to perform a duty imposed by law; more specifically the duty to provide medical care for their son in a timely manner. And, three, that they intentionally or knowingly failed to perform that duty.
>
> In order for you to convict the state must prove beyond a reasonable doubt that the defendants' failure, individually or together, to provide medical care for Glenn Edward Tucker, Junior resulted in the infant's death.
>
> * * *
>
> Failure by parents to perform their parental duty which results in the death of their child, if done intentionally or knowingly is murder.

2/14/91 Transcript at 21, 23.

Defendants contend that the trial court's murder instruction was patently defective because it applied the "intentional or knowing" state of mind requirement to Defendants' failure to perform a duty, without indicating that Defendants must have "intentionally or knowingly" caused Baby Glenn's death. Defendants maintain, therefore, that the jury was improperly advised that murder liability could be established if Elena or Glenn were determined to have intentionally or knowingly failed to provide timely medical care to Baby Glenn, even if they had absolutely no intention of causing Baby Glenn's death, and did not know that his death was practically certain to occur.

The State argues, however, that the trial court's instruction was a proper statement of the law. The State contends that HRS § 702–204 mandates only that a person *act* with the requisite state of mind in order to be found guilty of an offense, and since omission is inaction, HRS § 702–204 is inapplicable to this case. The State also points out that the Commentary to HRS § 702–203 states in part that:

> a parent, under civil law, owes a duty to provide food and shelter for his or her infant child. *The intentional or reckless omission to perform the duty may result in a conviction for murder or manslaughter, respectively, if the omission causes the death of the child.* [Footnote omitted; emphasis added.]

The State therefore insists that penal liability for murder by omission can be established if a defendant intentionally or knowingly fails to perform a duty imposed by civil or penal law, and it is not necessary to prove a separate state of mind as to the element of causation.

In *State v. Batson*, 73 Haw. 236, 831 P.2d 924 (1992), the defendant was charged with murder by commission (*i.e.*, "by striking" his son) and by omission (*i.e.*, by "failing to seek and obtain medical treatment and attention for the injuries [his son] sustained") in the death of his son. On appeal, the defendant claimed that the prosecution failed to prove that he intentionally or knowingly caused his son's death and therefore he should not be convicted of second degree murder. 73 Haw. at 252, 831 P.2d at 933.

The issue on appeal in *Batson* was whether there was substantial evidence on the record to support the trial court's conclusion that the defendant acted knowingly — that he was aware that it was practically certain that his conduct by commission and omission would result in his son's death. 73 Haw. at 252, 831 P.2d at 933. The supreme court in *Batson* noted that "[t]he omission of a duty is . . . the equivalent of an act and when death results, the standard for determination of the degree of homicide is identical." 73 Haw. at 253, 831 P.2d at 933 (quoting *People v. Burden*, 72 Cal. App. 3d 603, 616, 140 Cal. Rptr. 282, 289 (1977)). In addition, the supreme court stated that "[a] combination of individual acts of physical abuse and omissions to discharge parental duties and responsibilities, when coupled with the requisite state of mind, may rise to the level of murder." *Id.* at 253, 831 P.2d at 933. The supreme court therefore made no distinction between the elements to support a murder by omission as opposed to a murder by commission.

In light of the *Batson* decision, it is clear that the trial court's murder instruction was fatally flawed and resulted in prejudice to Defendants. Consequently, the prosecutor's closing argument, which was based on the erroneous instruction, was likewise improper.

## II.
## Admissibility of Redacted Confessions

Elena and Glenn gave several self–incriminating statements, which were tape–recorded, to police officers investigating Baby Glenn's injuries and death.

Prior to trial, the State filed a Notice of Intent to Use Evidence, indicating its intent to introduce these statements at trial. At a hearing on defense counsels' objections to the proffered statements, the trial court ruled that the statements would be admissible at trial, if they were redacted to eliminate those parts which inculpated the other spouse, or if the phrase "another person" or "other person" were substituted for the names of the inculpated codefendant spouse. The court also agreed to give the jury a limiting instruction prior to receipt of such statements.

### Elena's Statements

Elena gave five statements to the police. The first three statements are not at issue in this appeal, since they did not in any way incriminate Glenn for the alleged murder of his son.[2]

--------

[2]
Elena's first statement was made on the evening of March 6, 1990, while Baby Glenn was in the intensive care unit at Kapiolani Medical Center. In this statement, Elena blamed Lisa Major for hitting Baby Glenn. Elena also claimed that she called Dr. Raymond Wong to make an appointment for Baby Glenn when she noticed his injuries, but Lisa Major said Baby Glenn didn't need to go to the doctor. Elena's second statement to police made on March 7, 1990, again accused Lisa Major for Baby Glenn's injuries. In her third statement, at 12:42 p.m. on March 13, 1990, Elena admitted that she had lied when she accused Lisa Major of hitting Baby Glenn and when she claimed to have called Dr. Wong for an appointment to check out Baby Glenn's injuries. Elena acknowledged that Baby Glenn had a lump on his head the size of a

Glenn contends, however, that the trial court erred by admitting into evidence redacted versions of Elena's fourth and fifth statements to police.

In Elena's redacted fourth statement to police, she implicated Glenn as the cause of Baby Glenn's injuries. Elena stated that on Sunday, March 4, 1990, Glenn "whacked" Baby Glenn twice on the back of his head with a car jack stand. She claimed that the baby fell flat in motionless silence as a result of the blows and began crying only after she picked him up. Elena also said that when Glenn realized that she had witnessed the beating, he told her "not to say anything to nobody."

A few hours after Elena had given her fourth statement, she was interviewed briefly by police about inconsistencies in her fourth statement regarding the jack stand used to strike Baby Glenn. She then gave her fifth statement, in which she changed her story and stated that Glenn had struck Baby Glenn only once. She also said that she wasn't sure if the striking instrument was a jack stand, but described it as a hard, dark object, the size of a note pad.

Elena's fourth and fifth statements were extensively redacted to totally eliminate passages that directly referred to Glenn and to substitute the phrase "another person" for Glenn's name in the remaining passages. As a result, Elena's fourth statement, which was originally thirty-nine pages, was redacted to completely delete fourteen entire pages, as well as substantial portions of twenty other pages, before the trial court allowed a redacted audio version to be played for the jury.

chicken egg which kept getting bigger, that he was fussy and crying, and that he began throwing up. However, she didn't know how Baby Glenn had gotten hurt and was afraid to seek help for him because she was afraid she would be blamed for his injuries.

Glenn argues, however, that even with the redactions, it was obvious from the context of the statements that he was the "person" whom Elena alleged struck Baby Glenn with the jack stand. Because he was not allowed to cross–examine Elena about these and other statements, Glenn alleges that his constitutional right of confrontation was violated.

## Glenn's Statements

Glenn gave three statements to police. In his first statement, on March 6, 1990, Glenn related that he had not been aware that his son was injured and had not noticed any bruising on the baby's body for the past few days. He also recounted that on March 5th, Elesha, the Majors' three–year–old daughter, had pulled a pillow out from under Baby Glenn's head, causing Baby Glenn to fall off the couch and hit his head on the tile floor.

On March 8, 1990, Glenn gave police a second statement. In this statement, he admitted that he knew Baby Glenn was hurt, was drowsy and fussy, and had a bump on his head that was beginning to swell, but said that he was afraid to take his son to the doctor for fear CPS would get after him. Glenn also implicated Elena as being the source of Baby Glenn's injuries and reiterated that his son had fallen off the sofa when the Majors' three–year–old daughter had pulled out a pillow that was supporting him.

On March 8, 1990, Glenn gave his third statement to police. In this statement, Glenn said that on Saturday evening, he heard a loud bump like something had hit the floor, and two minutes later he heard Baby Glenn crying. When he went to investigate, Elena told him that she had accidentally bumped Baby Glenn's head against an apartment door. Glenn additionally told the police that on the same day as the door incident, he and Elena argued, and

during the argument, Elena threw an ashtray at him, which inadvertently struck Baby Glenn in the head. Glenn admitted that he knew his son was ill and had a bump on his head that was beginning to swell. However, he said he did not have any transportation to take his son to the doctor and did not consider his son's injuries serious enough to require an ambulance. He also stated that he was afraid to take the baby to the doctor for fear that CPS would get involved.

Glenn's statements were not as extensively redacted as Elena's fourth and fifth statements had been. Instead, references to Elena were deleted, and the phrase "another person" was substituted for her name, whenever it was deleted. Also, references to "them" were changed to "him."

Elena contends that despite these precautions, she was still strongly implicated by the context in which Glenn's statements were made, and because she was not allowed to cross-examine Glenn, her confrontational rights were violated.

**The Right to Confrontation Guaranteed by the Sixth Amendment of the United States Constitution and Article I, § 14 of the Hawai'i Constitution**

The use of the redacted statements in this case implicates the right of confrontation guaranteed by the sixth amendment of the United States Constitution,[3] which is applicable to the states by the fourteenth amendment. *Pointer v. Texas*, 380 U.S. 400, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965). Article I, § 14 of the Hawai'i State Constitution provides a similar guarantee.

---

[3] The sixth amendment provides in part that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]"

The primary object of the confrontation guarantee is to prevent the use of depositions or *ex parte* affidavits in a criminal proceeding. The guarantee affords the accused the opportunity to test witnesses by cross–examination, and requires witnesses to subject themselves to the scrutiny of the jury. *Mattox v. United States*, 156 U.S. 237, 243–44, 15 S. Ct. 337, 389, 39 L. Ed. 409, 411 (1895). "The overarching 'mission' of this clause is to advance a practical concern for the accuracy of the truth–determining process of criminal trials." *State v. Narvaez*, 68 Haw. 569, 573, 722 P.2d 1036, 1039 (1986) (citations omitted).

In *Bruton v. United States*, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968), the United States Supreme Court established that a defendant's sixth amendment right to confrontation is violated when the unredacted facially incriminating confession of a codefendant is introduced at their joint trial, even if the jury is specifically instructed to consider the confession only against the codefendant.[4] The Court concluded that there was a substantial risk that the jury ignored the curative instruction and used the codefendant's confession against Bruton, thus violating Bruton's sixth amendment right to confrontation:

> [T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions

---

[4] In *State v. Pastushin*, 58 Haw. 299, 568 P.2d 504 (1977), the Hawai'i Supreme Court, applying *Bruton*, reversed a defendant's conviction, after concluding that the oral confession of a non–testifying codefendant, "more than any other evidence," "directly and pointedly" implicated the defendant in the commission of the offense charged, thus violating the defendant's rights under the confrontation clause of the sixth amendment. 58 Haw. at 301, 568 P.2d at 506.

is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side–by–side with the defendant, are deliberately spread before the jury in a joint trial. Not only are the incriminations devastating to the defendant but their credibility is inevitably suspect, a fact recognized when accomplices do take the stand and the jury is instructed to weigh their testimony carefully given the recognized motivation to shift blame onto others. The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross–examination. It was against such threats to a fair trial that the Confrontation Clause was directed.

391 U.S. at 135–36, 88 S. Ct. at 1627–28, 20 L. Ed. 2d at 485 (citations and footnotes omitted).

The United States Supreme Court subsequently narrowed its *Bruton* ruling in two respects.

First, in *Harrington v. California*, 395 U.S. 250, 89 S. Ct. 1726, 23 L. Ed. 2d 284 (1969), the Court held that admission into evidence of an unredacted facially incriminating statement of a codefendant does not offend the Confrontation Clause and mandate reversal of a conviction, if, considering all the other evidence in the case against the defendant, the error is "harmless beyond a reasonable doubt." 395 U.S. at 254, 89 S. Ct. at 1728, 23 L. Ed. 2d at 288.

Thereafter, in *Richardson v. Marsh*, 481 U.S. 200, 107 S. Ct. 1702, 95 L. Ed. 2d 176 (1987), the Supreme Court held that the admission of a non–testifying codefendant's confession with a limiting instruction did not violate the Confrontation Clause, when "the confession was redacted to eliminate not only the defendant's name, but any reference to his or her existence." 481 U.S. at 212, 107 S. Ct. at 1709, 95 L. Ed. 2d at 188. The Court did not consider it likely that the jury would disregard the limiting instruction, since the confession did not facially incriminate the defendant but only became incriminating when linked to the defendant's own testimony introduced later at trial. 481 U.S. at 208, 107 S. Ct. at 1708, 95 L. Ed. 2d at 186. Justice Scalia, writing for the majority, rejected as impractical, the suggestion that defendants be tried separately whenever an incriminating statement of one of them is sought to be introduced at trial, pointing out how important confessions are to the criminal justice system:

> It would impair both the efficiency and the fairness of the criminal justice system to require, in all these cases of joint crimes where incriminating statements exist, that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last–tried defendants who have the advantage of knowing the prosecution's case beforehand. Joint trials generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability — advantages which sometimes operate to the defendant's benefit. Even apart from these tacti-

cal considerations, joint trials generally serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts. The other way of assuring compliance with an expansive *Bruton* rule would be to forgo [sic] use of codefendant confessions. That price also is too high, since confessions "are more than merely 'desirable'; they are essential to society's compelling interest in finding, convicting, and punishing those who violate the law."

481 U.S. at 210, 107 S. Ct. at 1708–09, 95 L. Ed. 2d at 187–88 (citation and footnote omitted).

The *Richardson* Court expressly limited its ruling to the situation in which a codefendant's confession is redacted to eliminate not only the defendant's name, but all references to the defendant's existence or role in the crime. In a footnote, the Supreme Court specifically "express[ed] no opinion on the admissibility of a confession in which the defendant's name has been replaced with a symbol or neutral pronoun." 481 U.S. at 211, n.5, 107 S. Ct. at 1709, n.5, 95 L. Ed. 2d at 188, n.5.

The State argues that the very issue which the *Richardson* Court declined to confront was addressed by the Hawai'i Supreme Court in **State v. Torres**, 70 Haw. 219, 768 P.2d 230 (1989), in which the supreme court approved of the practice of substituting a defendant's name with a symbol or neutral pronoun. In *Torres*, the trial court admitted into evidence the post–arrest statement of a non–testifying codefendant, which had been redacted to replace all references to the defendant's name with the phrase "the other person." Citing *Bruton* and *Richardson*, the supreme court concluded that the Confrontation Clause was not violated because:

[Codefendant's] references to another person related only to the burglary charge, of which [Appellant] was acquitted, and not to the felon in possession conviction being appealed from here. Therefore, we cannot say that [codefendant's] confession "powerfully incriminated" Appellant in the possession charge. Nor can we say that it was [codefendant's] statement, "more than any other evidence," which established before the jury that Appellant illegally possessed the shotgun.

\* \* \*

Moreover, even if the admission of [codefendant's] confession referring to "another person" violated *Bruton*, the admission of the statement was harmless beyond a reasonable doubt.

70 Haw. at 223, 768 P.2d at 233 (citations omitted). The supreme court's conclusion was thus based on the particular facts in *Torres*, which were clearly distinguishable from the *Richardson* facts, where the redacted statement eliminated all references to the involvement of the defendant. We therefore do not construe *Torres* as adopting a rule that a non–testifying codefendant's confession is admissible *per se* if any incriminating references to the defendant's name are replaced by a neutral phrase or symbol.

Since *Richardson*, courts in other jurisdictions have adopted different tests to decide the admissibility of a codefendant's confession, redacted to substitute a neutral pronoun or other general word for the name of the defendant.

The majority of federal circuits have applied a rule of admissibility *per se*, admitting into evidence any redacted confession that, on its face, does not incriminate the defen-

dant. *United States v. Williams*, 936 F.2d 698, 700 (2d Cir. 1991); *United States v. Vogt*, 910 F.2d 1184, 1192 (4th Cir. 1990), *cert. denied*, 498 U.S. 1083, 111 S. Ct. 955, 112 L. Ed. 2d 1043 (1991); *United States v. Strickland*, 935 F.2d 822, 826 (7th Cir. 1991), *cert. denied*, ___ U.S. ___, 112 S. Ct. 884, 116 L. Ed. 2d 787 (1992); *United States v. Vasquez*, 874 F.2d 1515, 1518 (11th Cir. 1989), *cert. denied*, 493 U.S. 1046, 110 S. Ct. 845, 107 L. Ed. 2d 840 (1990).

In comparison, the Eighth Circuit Court of Appeals, has taken a different approach. It analyzes whether "presentation of the redacted statement draws the jury's attention to the fact that a name was omitted, and invites the jury to fill in the blank." *United States v. Long*, 900 F.2d 1270, 1280 (8th Cir. 1990). If speculation is invited, the confession is deemed inadmissible as violative of the sixth amendment right to confrontation. *Id.*

The Michigan Supreme Court has similarly taken a case–by–case contextual approach in determining the admissibility of a redacted confession. In *People v. Banks*, 438 Mich. 408, 475 N.W.2d 769 (1991), *cert. denied*, ___ U.S. ___, 112 S. Ct. 955, 117 L. Ed. 2d 122 (1992), the court stated:

> In cases such as the one before us now, where redaction is achieved through replacement of the defendant's name with a neutral pronoun or "blank," the ease with which a jury will be able to fill in a blank will vary from case to case, depending upon the overall evidentiary context in which it is introduced to the jury. A rule of admissibility per se is simply not appropriate for the form of redaction used in the case at bar.

We therefore return to the basic tenets of *Bruton*. Because codefendant statements are "inevitably suspect" because of the strong potential for blame shifting, *Bruton, supra*, 391 U.S. p. 136, 88 S.Ct. p. 1628, even redacted confessions like the one challenged here should be clothed with a presumption of unreliability. If a "substantial risk" exists that the jury, despite cautionary instructions, will consider a codefendant's out–of–court statement in deciding the defendant's guilt, the statement — even though redacted to delete the defendant's name — will be rendered inadmissible at a joint trial. *Bruton, supra*, p. 128, 88 S.Ct. p. 1622. Other independent evidence may, by necessity, have to be considered:

> "[T]he court must decide whether the statement incriminates the defendant against whom it is inadmissible in such a way as to create a 'substantial risk' that the jury will look to the statement in deciding on that defendant's guilt. Such an assessment may require consideration of other evidence in order to determine whether mere deletion of the defendant's name will be effective in making the statement non–incriminating as to him. But consideration of the weight of independent evidence is both improper and unnecessary to determination of the *Bruton* issue at the trial court level." *Hodges v. Rose*, 570 F.2d 643, 647 (CA 6, 1978), cert. den. 436 U.S. 909, 98 S.Ct. 2243, 2244, 56 L.Ed.2d 408 (1978). See

also *Foster v. United States*, 548 A.2d 1370 (App. D.C., 1988) (and cases cited therein).

We believe that this case–by–case approach best protects the Confrontation Clause rights of a defendant in situations where redaction is used to edit an otherwise inadmissible out–of–court statement.

438 Mich. at 420–21, 475 N.W.2d at 774–75 (footnotes omitted).

In our view, the case–by–case approach is preferable. It more fairly protects a defendant's confrontational rights, and at the same time allows the use of a joint trial when doing so will not undermine the purpose of the right. We, therefore, evaluate Elena's and Glenn's redacted confessions in light of this standard.

## Analysis of Elena's and Glenn's Redacted Confessions

### A. Elena's Statements

As indicated, Elena's fourth and fifth statements were extensively redacted to eliminate any reference to Glenn.[5] Glenn contends, however, that although the trial court eliminated his name from the statements, his existence was still apparent and obvious from the context of Elena's statements. We agree.

---

[5] We note that because Elena's statements were so extensively redacted, there is a clear possibility that the statements prejudiced her defense. Significant and obvious gaps appeared in her redacted statement, especially since several unrelated questions follow each other with no responses, and the jury could have easily surmised that information had been deleted from the statements. One legal commentator has observed that:

The statements clearly conveyed to the jury that Elena witnessed an assault on Baby Glenn so forceful that he fell flat on his face in silence; that the weapon came from the closet next to the bedroom which she and Glenn occupied; that the weapon was too heavy for her to lift; that she knew who committed the assault but didn't get help because she "was told not to say anything"; and that she had been taking care of "our daughter" at the time of the assault. Moreover, although Elena's statements were extensively redacted to eliminate all direct references to Glenn, Elena's references to "Eddy" [George Major], who had previously been described as a violent person and a possible suspect in Baby Glenn's death, were left in the statement.

In view of the evidentiary context in which Elena's statements were presented to the jury, we believe that a substantial risk existed that the jury would surmise that the individual who was responsible for striking Baby Glenn and advising Elena "not to tell anyone" was her husband, Glenn. The statements were therefore "power-

---

Generally, taking fragments of a document out of context causes distortion. Redaction designed to eliminate all references to a codefendant, however, actually rewrites the document, distorting the facts presented to the jury. The jury, being unaware of the redaction, attributes the redacted confession to the confessor. Because confessions are often patently implausible after the type of redaction used in *Marsh*, the jury might begin to question the confessor's credibility. It might disbelieve mitigating aspects of his confession and find him guilty of a more serious offense than it would have absent the redaction. . . . Fully redacted confessions carry a great risk of prejudice to the confessor. Only the most single–minded devotion to judicial economy could allow the convenience of joint trials to overcome an accused person's right to have the jury consider his confession in an undistorted form.

Case Note, *Richardson v. Marsh: Codefendant Confessions and the Demise of Confrontation*, 101 Harv. L. Rev. 1876, 1889–90 (1988) (footnotes omitted).

fully incriminating" as to Glenn and should not have been admitted into evidence in the form presented to the jury.

## B. Glenn's Statements

Glenn's statements, unlike Elena's, were not substantially redacted to eliminate entire pages or sections that referred to Elena. Instead, the trial court, relying on *State v. Torres*, *supra*, allowed references to Elena to be replaced by the phrase "another person" or "other person." Also, references to "them" were replaced by "him."

Elena contends that although these precautions were taken, she was still strongly implicated in view of the context in which the statements were made. We agree.

Glenn's statements revealed that "[a]nother person had the baby and tried to open the door and bumped the baby's head against the door by accident." While Glenn didn't actually witness the accident, he heard a loud bump, followed by Baby Glenn's crying, and went to investigate what had happened. He was told that "[a]nother person had the baby and opened the door and it got stuck on the rug so the other person pulled on it and it — it banged the baby's head." State's Exhibit 96 at 5, 7. Glenn also indicated that Lisa Major had heard the loud bump and asked, "if everything was okay with the baby." The next morning, Lisa again asked if the baby "was all right." *Id.* at 12, 30. Glenn further mentions, "[Y]ou know, I told another person take [Baby Glenn] to the doctor's on Monday. I told the other person take him on Sunday too." *Id.* at 19. Glenn also responded to questions about an incident in which an ashtray thrown at him hit the baby instead. After Glenn described the ashtray, the following colloquy occurred:

Q How many of these ashtrays do you have?
A I only just got the one. Because her grandmother gave it to me.

QQ Glenn, did baby cry when the ashtray hit him?

A Well, he was crying before I picked him up.

QQ As soon as the ashtray hit him, he cried?

A Uh–hum.

*Id.* at 42–43.

Although the jury was specifically instructed that it was not to infer that Elena was the "other person" referred to in Glenn's statement, we believe that it was difficult for the jury to not make the inference in the instant case. Only Glenn's references to Elena were redacted; his references to Lisa and George remained in his statement. There is thus a very real possibility that the jury inferred that Elena, the only other adult in the household, was the "other person" whom Glenn directed to take his child to the doctor. As Elena points out, a husband/father would be unlikely to give such a direction to anyone but his wife, the mother of his child. Glenn's statement that the ashtray which hit Baby Glenn was a gift from "her grandmother" also obviously indicates that "her" is Elena, since there was considerable testimony at trial about Elena's grandmother.

We therefore conclude that the introduction of Glenn's redacted statements into evidence violated Elena's confrontational rights.

## Harmless Error Analysis

Normally, a finding that a statement was introduced into evidence in violation of the *Bruton* principles does not end the inquiry, since the violation is subject to the harmless error standard. *Harrington*, 395 U.S. 250, 89 S. Ct. 1726, 23 L. Ed. 2d 284. We find it unnecessary to engage in such an inquiry, however, in view of our conclusion that the trial court's erroneous jury instruction on murder

requires vacation of the judgment and remand for a new trial.

## III.

### Other Alleged Errors

The Defendants have alleged that the trial court committed several other errors in its evidentiary rulings and instructions to the jury. However, in view of our decision to vacate the judgments below and remand these cases for appropriate proceedings, we find it unnecessary to address these issues.

### CONCLUSION

In summary, we conclude that the trial court reversibly erred when it gave a flawed jury instruction on the elements of murder in the second degree, which led to an improper closing argument by the prosecutor. The court also erred when it admitted into evidence the redacted confessions of Elena and Glenn, which implicated the other spouse. We accordingly vacate the judgment and remand for proceedings consistent with this opinion.[6]

---

[6] For the prosecutor's and trial court's guidance on retrial, we note that the American Bar Association (ABA) has adopted a model standard for dealing with situations involving multiple defendants and codefendant confessions. Standard 13–3.2, II ABA STANDARDS FOR CRIMINAL JUSTICE 13.34 (2d ed. 1986 Supp.), entitled "Severance of defendants," provides in relevant part:

(a) When a defendant moves for severance because an out–of–court statement of a codefendant makes reference to, but is not admissible against, the moving defendant, the court should determine whether the prosecution intends to offer the statement in evidence as part of its case in chief. If so, the court should require the prosecuting attorney to elect one of the following courses:

(i) a joint trial at which the statement is not admitted into evidence;

*Steven West*, Deputy Public Defender (*Linda C. Ramirez*, Deputy Public Defender, on the briefs), for defendant–appellant Elena Louise Tucker.

---

 (ii) a joint trial at which the statement is admitted into evidence only after all references to the moving defendant have been deleted, provided that, as deleted, the statement will not prejudice the moving defendant; or

 (iii) severance of the moving defendant.

The Commentary to Standard 13–3.2 states in relevant part:

 The standard provides that a prosecutor who does intend to use the statement of a codefendant in the prosecution's case in chief must elect to abandon the statement, to modify the statement by effectively deleting references to the moving defendant, or to sever the moving defendant. The duty to elect is placed upon the prosecutor rather than upon the court, because the prosecutor is in a better position to evaluate which course of action will have the least impact upon the prosecution case and upon the prosecution caseload.

 Two of the prosecutor's options are accompanied by significant disadvantages: abandonment of the statement weakens the case against the codefendant while severance of the moving defendant results in duplicate trials. Some jurisdictions have experimented with unusual trial procedures that may protect the moving defendant while minimizing the costs to the prosecution. One experiment involves a joint trial in which the jury hears the statement of the codefendant only after it has reached a verdict on the moving defendant. A second experiment involves a joint trial with two juries, each of which hears only the evidence relevant to its defendant. Such experiments may provide solutions not only to the specific problem of codefendant statements but also to some of the general problems of prejudice that occur in joint trials.

 In the meantime, the modification or redaction of the statement is likely to be the option preferred by the prosecutor, who will then be able to use the statement against its maker without incurring the expense of duplicate trials. However, not all statements can be successfully edited to delete references to the moving defendant. If the references to the moving defendant are

*Pamela J. Berman*, Court–appointed attorney for defendant–appellant Glenn Edward Tucker, Sr.

*Caroline M. Mee*, Deputy Prosecuting Attorney, City and County of Honolulu, for plaintiff–appellee.

---

central to the statement, the edited product may be meaningless or distorted "to the substantial prejudice of either the declarant or the Government." Where the prosecutor's deletions are ineffective, the court must require the prosecutor to elect one of the other options.

*Id.* at 13.36–13.37 (footnotes omitted).