922 P.2d 358

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Kristen J. ROBINSON, Defendant–Appellant.**

**No. 18756.**

Supreme Court of Hawai'i.

July 10, 1996.

Rose Anne Fletcher, Deputy Public Defender, on the briefs, Honolulu, for defendant-appellant.

Maurice M. Arrisgado, Deputy Prosecuting Attorney, on the briefs, Honolulu, for plaintiff-appellee.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

MOON, Chief Justice.

Following a jury trial, defendant-appellant Kristen J. Robinson appeals from her conviction and sentence for assault in the first degree, in violation of Hawai'i Revised Statutes (HRS) § 707–710 (1993).[1] On appeal, Robinson contends that the trial court erred by: (1) giving a misleading and/or insufficient instruction that could have confused the jury; (2) refusing to instruct the jury that it was entitled to consider all the circumstances surrounding her extrajudicial admission and weigh it accordingly; (3) refusing to instruct the jury on the included offense of assault in the third degree; and (4) sentencing her to a mandatory minimum sentence where the "ag-

---

1. HRS § 707–710 provides: "(1) A person commits the offense of assault in the first degree if the person intentionally or knowingly causes serious bodily injury to another person. (2) Assault in the first degree is a class B felony."

gravating factor" of the victim's age was not submitted to the jury. Because we believe that the jury instructions, when read and considered as a whole, were prejudicially insufficient and had the potential to mislead the jury, we vacate Robinson's conviction and remand this case for a new trial consistent with this opinion. Notwithstanding Robinson's final two contentions, we discern no other error.

## I. *BACKGROUND*

Robinson's conviction was based upon the injuries sustained by the victim, an eleven-month-old male child (victim), for whom Robinson had contracted to provide day care. The victim's parents, Lee and Megan Jones [hereinafter, collectively, the Joneses], were both enlisted in the United States Navy and lived on the Naval base in Wahiawā. Lee Jones was commissioned to a ship, and Megan Jones (Mrs. Jones) worked as a cryptographer on the Wahiawā base.

Beginning in late July or early August 1991, the Joneses engaged the services of Robinson, who was nineteen years old at the time, also lived on the Naval base, and had undergone training for certification by the Navy as a child care provider. The written contract between the Joneses and Robinson provided, *inter alia*, that Robinson care for the victim from Mondays through Fridays while Mrs. Jones was at work and that she notify the Joneses if the victim sustained any injuries, major or minor.

At trial, Mrs. Jones testified to the following sequence of events and the victim's symptoms in the weeks preceding November 21, 1991:

November 10 (Sunday) Because the victim had a "nasty croupy cough," Mrs. Jones took him to Schofield Emergency Medical Clinic. The doctor instructed her to give him Robitussin and advised that otherwise he was fine. At this time, the victim's behavior was normal.

November 11 & 12 The victim was in Robinson's care from 6:45 a.m. to 3:00 p.m. on both days and was behaving normally.

November 13 The victim was in Robinson's care. Near the end of her work day, Robinson called Mrs. Jones, advising that the victim had been lethargic, hadn't eaten, had slept more than usual that day and had begun vomiting. Mrs. Jones picked up the victim and took him to Tripler Army Medical Center Emergency Room, where she was told that the victim probably had a stomach virus.

November 14 Mrs. Jones took the victim to Robinson's residence for approximately half an hour, while she sought permission to take time off from work to attend to her child. Mrs. Jones retrieved the victim at 7:00 a.m. and took him to Pearl Harbor Medical Clinic. The doctor there prescribed antibiotics and a nasal decongestant.

November 15 The victim stayed with Mrs. Jones all day. She took him back to the same doctor at the Pearl Harbor Medical Clinic for a recheck.

November 16 (Saturday) The victim was still lethargic, but he was not vomiting as much and was able to hold down more of his bottle.

November 17 (Sunday) Lee Jones arrived home from his ship. The victim seemed somewhat improved and was able to eat. That evening, however, he was restless, crying, and pulling at the sides of his head as though he had an ear infection. He slept in bed with the Joneses, but only fitfully.

November 18 Mrs. Jones took the victim to Robinson's home. Robinson called Mrs. Jones during the day and told her that the victim started vomiting again and was really fussy and crying a lot. Mrs. Jones picked up the victim and took him to Tripler Army Medical Emergency. The doctor told her that there was fluid in the victim's ears, to keep him on the antibiotics, and to give him "Pedialyte" to prevent dehydration. The victim cried most of the night; at other times, he was lethargic and would not play.

November 19 Mrs. Jones took the victim to Robinson's. He slept for most of

the day. Mrs. Jones was unable to get him an appointment with the doctor that evening.

November 20 Mrs. Jones stayed home from work and took the victim to the doctor at Pearl Harbor. The doctor told Mrs. Jones that the victim might be having an allergic reaction to the decongestant and to discontinue its use.

Robinson testified that, when Mrs. Jones dropped off the victim between 6:00 and 6:30 on the morning of November 21, 1991, he looked pale and that he had slept most of the day. At about 2:45 p.m., Robinson woke him to get him ready to go home. She changed his diaper and sat him on the floor while she went into the kitchen to throw away the dirty diaper and get him some juice. She heard him fall over, and, concerned that he was going back to sleep, went to pick him up. When she picked him up, he was stiff and unresponsive. After tickling the bottom of his feet and rubbing his cheek, he remained unresponsive. At that point, she grabbed her own ten-month old son in her other arm and ran with the two boys to a neighbor's house. Robinson asked the neighbor to watch her son while she took the victim to the clinic on base, about two blocks from her home, but the clinic was closed. Robinson then flagged down an acquaintance, who was driving by, and they took the victim to the Schofield Barracks emergency room. When they arrived at the emergency room, the victim was unconscious and having seizures. Meanwhile, Robinson's neighbor called Mrs. Jones, who arrived at the Schofield emergency room and rode with the victim in the ambulance to Tripler Army Medical Center.

The victim was identified as a "suspected child abuse and neglect" patient. At trial, three of the doctors who had been involved with the diagnosis and treatment of the victim's injuries were called as witnesses. Anthony G. Botinni, M.D., was deputy chief of neurosurgery at Tripler when the victim was admitted. Dr. Bottini testified that when he saw the victim, the victim's status was "critical." The victim was unconscious, not breathing for himself, and had been admitted to the intensive care unit. A CT scan showed that the victim had a very extensive subdural hematoma over his right cerebral hemisphere and three skull fractures. Dr. Bottini offered his expert opinion that, given the extensive underlying injuries and the absence of any external scalp laceration or a scalp contusion, there must have been force applied across a very broad surface where the skin itself was cushioned, for example, by the arm of a couch or a carpeted floor. When questioned regarding his opinion on whether the skull fractures could have been caused by the victim's head striking a bookshelf, Dr. Bottini opined that it was "more than improbable and perhaps impossible." Dr. Bottini explained:

> [T]he only place that would be accessible on this [book]shelf would be an edge or a corner. And something like that striking a baby's head that hard would not only disrupt the scalp but probably produce a different fracture pattern where the fracture, rather than being this linear spider-like fracture, would probably be driven in.... Driven in, depressed.

He also expressed the opinion that the fractures could not have been caused solely by "Shaken Baby Syndrome," but would require blunt trauma. Specifically, Dr. Bottini testified:

> Shaken Baby Syndrome, sudden acceleration and deceleration and rotation of a child may produce other things. I mean it may produce some bleeding on the surface of the skull, it may produce some of these hemorrhages at the back of the eye, but to have a fracture pattern like this and to have the extensive area of these injuries, I think it requires impact.

Dr. Bottini described the kind of symptoms a child would exhibit after sustaining the type of injuries that the victim presented:

> as you have brain swelling and the pressure increases inside a child's skull they become less responsive, they become lethargic, irritable.... [T]hey respond by crying, by decreased activity, frequently and very characteristically by vomiting. Children with head injuries typically vomit. And in severe injuries they progressively have a declining level of consciousness and potentially coma.

As to when the trauma occurred, Dr. Bottini could only say that it did not occur more than ten days to two weeks before the victim was brought to Tripler on November 21 and that it was possible that the trauma occurred on more than one occasion.

James Olson, M.D., assistant chief of opthamology at Tripler, testified that his first examination of the victim was on November 22, 1991. His examination revealed that the victim had retinal hemorrhages (blood inside the eyes) that impaired his vision. He explained that retinal hemorrhaging was consistent with shaken baby syndrome, although he could not say for certain that shaking caused the hemorrhaging in this case.

> A child has a much larger head in proportion to the body, so if a child is picked up around the thorax or the chest and shaken back and forth the head flops around quite vigorously.... It's possible for the vessels that go into the brain to break loose and for bleeding to occur around the brain. Now, as the bleeding occurs, the pressure builds up in the brain and the blood could be forced through the nerves that go into the eye and end up inside the eye, and that's what we call shaken baby syndrome.

It was Dr. Olson's opinion that the victim would be permanently blind in his right eye.

Ronald Yamaoka, M.D., a pediatric neurologist, testified that

> there is controversy in the medical community about how the skull fractures occur in shaken baby syndrome because this is frequently seen. You see skull fractures and intracranial hemorrhage without external signs or bruises, and most of the medical literature says that if this is seen, this triad of retinal hemorrhage, intracranial hemorrhage, and skull fracture, without external bruises, that is shaken baby syndrome unless proven otherwise[,]

but generally agreed with Dr. Bottini that, in addition to violent shaking, some impact, even with a soft surface, would be required in order to produce the type of skull fractures sustained by the victim. Based upon the history of the victim's symptoms that Dr. Yamaoka had obtained from Mrs. Jones, he testified that the victim first exhibited symptoms of head injury, somnolence, lethargy, and vomiting, on November 13, 1991. Dr. Yamaoka's opinion was that the victim was initially injured on that date and that the fluctuation in the victim's symptoms indicate that he was injured more than once. Dr. Yamaoka also testified that it was likely that the victim would suffer some degree of permanent brain damage.

Timothy Husler, a special agent of the Naval Criminal Investigative Service, attached to Naval Air Station, Barber's Point, was assigned to investigate the suspected child abuse case on November 22, 1991. On that date, he interviewed medical personnel, the Joneses, and Robinson. Robinson described the events that led her to bring the victim to the hospital and denied dropping, hitting, throwing, shaking, or otherwise injuring the victim. Special Agent Husler asked Robinson if she would be willing to come to the Naval Investigative Service (NIS) Office at Barber's Point to be re-interviewed, and she agreed.

Robinson was re-interviewed at the NIS Office on December 10, 1991. Special Agent Husler testified that the interview was conducted by NIS Special Agent Luke McGranigan and that he, Husler, was not present for much of the interview. He re-entered the room to assist in typing Robinson's statement after Robinson admitted that, on November 19, 1991, she had been frustrated and upset with the victim, that she had picked him up and began shaking him, and that, while being shaken, his head struck a bookshelf. Special Agent Husler also testified that he had a subsequent interview with Robinson on December 18, 1991. Husler had gone to Robinson's house, with her consent, to retrieve the bookshelf and to ask Robinson additional questions. Robinson, at that time, restated that she had shaken the victim, causing his head to hit the bookshelf, and showed Husler where, on the shelf, the victim's head had struck.

Special Agent McGranigan testified regarding his December 10, 1991 interview of Robinson. He indicated that Robinson initially denied any involvement in or knowledge of the cause of the victim's injuries, but ultimately admitted that, on November 19, 1991, she had been frustrated and angry with

the victim because he would not stop screaming, so she shook him and the back of his head accidently hit the second shelf of the bookshelf. McGranigan further testified that he and Husler typed up her statement and that Robinson read and initialed the form, which contained an acknowledgment that "this statement is true and correct to the best of my knowledge."

Robinson was charged on May 5, 1992, by grand jury indictment, with first degree assault. On April 27, 1993, the grand jury returned a superseding indictment, which charged Robinson as follows:

On or about the 10th day of November, 1991 to and including the 21st day of November, 1991, in the City and County of Honolulu, State of Hawaii, Kristen J. Robinson did intentionally or knowingly cause serious bodily injury to [the victim], a child less than eight (8) years of age, by inflicting physical harm upon [the victim], and by failing to obtain reasonably necessary and available medical services for the injuries sustained by [the victim], thereby committing the offense of Assault in the First Degree, in violation of Sections 707–710[2] and 702–203[3] of the Hawaii Revised Statutes, and subjecting her to the penalty provisions for offenses against children, pursuant to Sections 706–662(5) and 706–660.2 of the Hawaii Revised Statutes.

The court thereafter granted the prosecution's motion to *nolle prosequi* the charge in the initial indictment.

Robinson's motion to suppress her oral statements to the NIS investigators, based on her assertion that the statements were not voluntarily made, but rather, coerced by threats, was denied by order filed February 18, 1993. In its findings of fact (FOF), conclusions of law (COL), and order, the court ruled that Robinson had voluntarily, knowingly, and intelligently waived her right to remain silent on December 10, 1991. A hearing on the voluntariness of Robinson's statement was held on October 25, 1994, at which

time the court ruled that, based upon the totality of the circumstances, the December 10, 1991 statement was voluntarily made. At trial, Robinson denied telling Special Agent McGranigan that she had shaken the victim, causing his head to strike the shelf, and testified that, as far as she knew, those facts had been fabricated by Special Agent McGranigan.

The court settled jury instructions on November 2, 1994. Although both the prosecution and the defense submitted instructions on assault in the first degree, which included the elements of assault by both commission and omission, the court modified the prosecution's proposed instruction, over the objection of the defense, by deleting that portion of the instruction pertaining to omission.

Relative to her inculpatory statement, the court refused to give an instruction requested by Robinson, which would have advised the jury that:

In determining whether any statement, claimed to have been made by a Defendant outside of court and after an alleged crime has been committed, was knowingly and voluntarily made, you should consider the evidence concerning such statement with caution and great care, and should give such weight to the statement as you feel it deserves under all the circumstances.

You may consider in that regard such factors as the age, sex, training, education, occupation, and physical and mental condition of the Defendant, her treatment while under interrogation, and all the other circumstances in evidence surrounding the making of the statement.

The court gave an instruction on assault in the second degree, but refused Robinson's request for an instruction on assault in the third degree.

On November 3, 1994, the jury returned its verdict, finding Robinson "guilty as charged." On December 23, 1994, the prosecution filed a "Motion for Mandatory Term of

---

2. *See supra* note 1.

3. HRS § 702–203 (1993) provides that:
   Penal liability may not be based on an omission unaccompanied by action unless:

(1) The omission is expressly made a sufficient basis for penal liability by the law defining the offense; or
(2) A duty to perform the omitted act is otherwise imposed by law.

Imprisonment." At the January 30, 1995 sentencing hearing, Robinson requested probation, arguing that the court did not have discretion to impose a mandatory term of imprisonment because the victim's age is intrinsic to the charge and therefore must be found by the jury in order for the mandatory term of sentence to be applicable. After considering the matter, the court sentenced Robinson to a ten-year term of imprisonment with a mandatory minimum term of three years and four months. Robinson appeals from the judgment, conviction, and sentence.

## II. *DISCUSSION*

■ "When jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent or misleading." *State v. Knight,* 80 Hawai'i 318, 324, 909 P.2d 1133, 1139 (1996) (citing *State v. Kinnane,* 79 Hawai'i 46, 49, 897 P.2d 973, 976 (1995)).

### A. *Circuit Court's Failure to Instruct Jury on Omission*

Robinson contends that "the trial court committed prejudicial error when it included among its instructions to the jury a misleading and/or insufficient instruction which could only have confused the jury." With regard to assault in the first degree, the jury was instructed that:

Kristen J. Robinson is charged with the offense of Assault in the First Degree.

A person commits the offense of Assault in the First Degree if she intentionally or knowingly causes serious bodily injury to another person.

There are two material elements to this offense, each of which must be proven beyond a reasonable doubt. The two elements are that:

1. Kristen J. Robinson caused serious bodily injury to [the victim]; and

2. She did so intentionally or knowingly.

The court next defined "serious bodily injury" and also instructed the jury that:

Under the law, Kristen J. Robinson had a duty to obtain reasonably necessary and available medical services for [the victim] if you find that:

1. She contracted to provide child care for [the victim]; or

2. she caused the injuries to [the victim].

Robinson characterizes the foregoing instruction as an "omission instruction" which, she argues, is prejudicially insufficient.

The single count indictment returned against Robinson charged her with first degree assault both by commission (that is, "by inflicting physical harm") and by omission (that is, "by failing to obtain reasonably necessary and available medical services"). In *State v. Batson,* 73 Haw. 236, 831 P.2d 924, *reconsideration denied,* 73 Haw. 625, 834 P.2d 1315 (1992), we established that "a single count joining alternative means of committing an offense in the conjunctive is ... acceptable, the disjunctive 'or' being subsumed within the conjunctive 'and.'" *Id.* at 250–51, 831 P.2d at 932. It follows directly from *Batson* that, "under the indictment in the present case, the prosecution was not required to prove separate and distinct cases of [first degree assault] by commission and omission against [Robinson] in order to establish guilt." *Id.* at 251, 831 P.2d at 932. The prosecution therefore argues that, because the jury was properly instructed on assault by commission, the court's failure to fully instruct the jury on omission was not prejudicial. The prosecution maintains that the instruction on Robinson's duty to obtain medical care, by this reasoning, was a harmless *non sequitur,* because "the jury knew that without more, the fact that Defendant had no duty would not preclude them from considering whether she injured child victim by her affirmative acts." We disagree.

■ It is not, as the prosecution contends, Robinson's burden "to prove that her conviction was the result of the instruction she challenges on appeal[.]" Rather,

" 'erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial.' " *State v. Pinero,* 70 Haw. 509, 527, 778 P.2d 704, 716 (1989) [herein-

after *Pinero I* ] (quoting *Turner v. Willis,* 59 Haw. 319, 326, 582 P.2d 710, 715 (1978)).

> [E]rror is not to be viewed in isolation and considered purely in the abstract. It must be examined in the light of the entire proceedings and given the effect which the whole record shows it to be entitled. In that context, the real question becomes whether there is a reasonable possibility that error might have contributed to the conviction.

*State v. Heard,* 64 Haw. 193, 194, 638 P.2d 307, 308 (1981) (citations omitted). If there is such a reasonable possibility in a criminal case, then the error is not harmless beyond a reasonable doubt, and the judgment of conviction on which it may have been based must be set aside.

*State v. Holbron,* 80 Hawai'i 27, 32, 904 P.2d 912, 917, *reconsideration denied,* 80 Hawai'i 187, 907 P.2d 773 (1995) (some brackets and some citations omitted). When examined in light of the entire proceedings, we believe that the instruction on legal duty was erroneous because it was a prejudicially insufficient instruction on omission or, alternatively, misleading because the jury was not instructed on the significance of finding that Robinson was under a duty to obtain medical services for the victim. We cannot say that the jury instruction on Robinson's legal duty was harmless beyond a reasonable doubt because there is a reasonable possibility that the instruction contributed to Robinson's conviction.

Robinson's failure to obtain medical care for the victim was a central theory of the prosecution's case. The indictment, which was read to the jury, charged her with assault by, *inter alia,* "failing to obtain reasonably necessary and available medical services for injuries sustained by [the victim.]" The prosecution presented evidence of Robinson's contractual duty to provide care for the victim and to inform the Joneses of any injuries to the victim. Testimony was elicited from Drs. Bottini and Yamaoka, both neurologists, that, had the victim's head injuries been reported to the doctors that were treating the victim before the onset of seizures, the outcome might have been different. Further, in his closing argument, the prosecutor explained his theory of omission to the jury as follows:

> So what is the legal charge in this case, just to perhaps explain that a little bit. It's a fairly simple charge. The defendant is charged with causing serious bodily injury to [the victim] and that she did so intentionally or knowingly, okay. State of mind is intentionally or knowingly. And the State's charge, it's a single charge but there are two different ways in which we have proven or tried to prove that she should be held accountable. *That's by committing the injuries or inflicting the injuries on Victim, and number two, she failed to get medical care or help for him when she should have.*
>
> Okay. So the question is, really, the bottom line question in this case is: Did she do it? She was the baby-sitter and didn't inflict the injuries, then how can you hold her accountable for having a duty to bring the child to medical care, because how would she know that he was in such serious shape that she should have taken him to the doctor right away, right?
>
> So this duty kicks in, this legal duty comes about two ways. One, and they kind of go together, one is the fact that they had a contract.... Even the defendant agrees that she had a contract with the Joneses. So that's the legal duty that she had as a child care provider, to provide medical care and services. But, as I said earlier, if she didn't know the child was hurt, how can we hold her accountable? So before we can hold her accountable with that duty, we have to establish that she intentionally or knowingly caused those injuries because if she knew she caused those injuries, then she was obligated under the law to take the kid to the medical care.

(Emphasis added.)

■ "It is the duty of the circuit judge to see to it that the case goes to the jury in a clear and intelligent manner, so that they may have a clear and correct understanding of what it is they are to decide, and he [or she] shall state to them fully the law applicable to the facts." *State v. Feliciano,* 62 Haw. 637, 643, 618 P.2d 306, 310 (1980). "This

requirement is mandatory to insure the jury has proper guidance in its consideration of the issues before it." *State v. Nakamura*, 65 Haw. 74, 79, 648 P.2d 183, 187 (1982).

The issue of omission, particularly of Robinson's duty to obtain reasonably necessary and available medical services for the victim, was repeatedly and squarely before the jury. There is a reasonable possibility that the court's failure to give the jury proper guidance in its consideration of that issue contributed toward's Robinson's conviction.

■ We have noted that HRS § 702–203, *see supra* note 3, provides, in relevant part, that "[p]enal liability may not be based on an omission unaccompanied by action unless . . . [a] duty to perform the omitted act is otherwise imposed by law." We have also noted, *see supra* note 1, that HRS § 707–710 provides in pertinent part that "[a] person commits the offense of assault in the first degree if the person intentionally or knowingly causes serious bodily injury to another person." To establish assault by omission, therefore, would require the jury to find beyond a reasonable doubt that, in addition to being under a duty imposed by law to obtain medical services, Robinson voluntarily omitted the performance of that duty, intending or knowing that her omission would cause serious bodily injury to the victim and that her failure to obtain medical services did, in fact, cause serious bodily injury to the victim. *See, e.g., State v. Cabral*, 77 Hawai'i 216, 219, 883 P.2d 638, 641 (App.) (listing elements and holding that, "in describing the elements of an offense based on the omission to perform a duty imposed by law under HRS § 702–203(2), the circuit court shall indicate in its instructions that the harm was caused 'by' the omission to perform the relevant duty"), *cert. denied*, 77 Hawai'i 489, 889 P.2d 66 (1994).

The jury, however, was not instructed on these elements. We therefore hold that the instruction on Robinson's duty was insufficient and had the potential to mislead the jury. If the jury, for example, following the instruction on "duty," found that such a duty existed, there is a reasonable possibility that, without further instruction, the jury could have concluded that, because Robinson had

been charged with causing serious bodily injury by, *inter alia,* failing to obtain reasonably necessary and available medical services and, because she had a duty "under the law" to obtain such services, she was—without more—"guilty as charged."

Even if the jury were able to divine that Robinson's omission of her duty to obtain medical services would need to be intentional or knowing in order to find her guilty of first degree assault, it could have interpreted the instructions given to mean that a mere intentional or knowing failure to obtain medical services, rather than a failure to obtain medical services coupled with intent or knowledge that the failure would result in serious bodily injury, was sufficient to establish culpability. *See State v. Tucker,* 10 Haw.App. 43, 861 P.2d 24 (murder instruction that applied "intentional or knowing" state of mind requirement to Defendants' failure to perform a duty, without instructing that Defendants must have intended or known that the failure to act would cause death, was fatally flawed, requiring reversal), *cert. granted, remanded on other issues,* 10 Haw.App. 73, 861 P.2d 37 (1993). Had the jury relied upon the prosecutor's closing argument for guidance, it would have been even more confused. The prosecutor intimated that, if Robinson "intended or knew" that she had caused *any* injury to the victim, then the breach of her duty to obtain medical care was sufficient to "hold her accountable" for the offense of first degree assault.

In the context of the issues that were presented to the jury for decision, the instructions given were prejudicially insufficient and misleading. Because we cannot say beyond a reasonable doubt that the jury found that Robinson, either by act or omission, had "intentionally or knowingly" caused the victim's serious bodily injury, the failure to fully instruct the jury requires that the conviction be vacated.

> B. *Circuit Court's Refusal to Give Requested Instruction that Jury Could Disregard Confession*

Relying on *State v. Kelekolio,* 74 Haw. 479, 849 P.2d 58 (1993), Robinson argues that the

trial court's refusal to instruct the jury that it should consider all of the circumstances when deciding how much weight to give to her confession was reversible error. In *Kelekolio*, the defendant urged on appeal "that the jury instructions as a whole were 'prejudicially insufficient' because 'the [trial] court never instructed the jury on the issue of the voluntariness of [his] confession,' thus depriving the jury of the opportunity to make the ultimate determination of whether [his] confession was freely and voluntarily made,'" and that "'the jury was never ... told that it could reject [his] confession if it found the confession to be involuntary.'" *Id.* at 514, 849 P.2d at 74.

In *Kelekolio*, we rejected the defendant's contention that he was entitled to have the jury accorded the opportunity to second guess the trial court's determination that his confession was not obtained in violation of the United States or Hawai'i Constitutions. However, we also recognized that, although it is within the province of the trial court to decide the purely legal question of the confession's constitutional admissibility, it is "the prerogative of the jury, as the judge of the facts, to determine the *weight and effect* of the confession or inculpatory statement with regard to its *credibility and reliability (i.e.,* its worthiness of belief) within the context of the ultimate factual issue of the defendant's guilt or innocence." *Kelekolio*, 74 Haw. at 518, 849 P.2d at 76 (internal quotation marks omitted and emphases in original) (citing *Crane v. Kentucky*, 476 U.S. 683, 688–89, 106 S.Ct. 2142, 2145–46, 90 L.Ed.2d 636 (1986)). We explained that

[t]he Court has never questioned that "evidence surrounding the making of a confession bears on its credibility" as well as its voluntariness.... [B]ecause *"questions of credibility, whether of a witness or of a confession, are for the jury,"* the requirement that the court make a pretrial *voluntariness* determination does not undercut the defendant's traditional prerogative to challenge the confession's *reliability* during the course of the trial.... Thus, ... evidence about the manner in which a confession was secured will often be germane to its probative weight, a matter that is exclusively for the jury to assess.

. . .

Accordingly, ... *entirely independent of any question of voluntariness, a defendant's case may rise or fall on his [or her] ability to convince the jury that the manner in which the confession was obtained casts doubt on its credibility.*

*Id.* at 516–518, 849 P.2d at 75–76 (quoting *Crane*, 476 U.S. at 688–89, 106 S.Ct. at 2145–46 (emphases in original)).

We held in *Kelekolio* that the jury instructions, considered as a whole, were not prejudicially insufficient. Kelekolio was not precluded from adducing evidence of the circumstances surrounding his interrogation, and the jurors were instructed, *inter alia*, that: (1) they were not bound to give all evidence the same weight; (2) they had the right to determine the credibility of each witness and give weight to his or her testimony accordingly; . and (3) "the use of deception should be considered in assessing both the reliability and trustworthiness of Kelekolio's statement and the likelihood that such 'trickery' produced a false confession." *Id.* at 519, 849 P.2d at 76.

Robinson's defense, in large part, was an attack on the reliability and credibility of her written statement. She was not precluded from adducing evidence of the circumstances under which the statement was given, and, as in *Kelekolio*, the jury was given general instructions on their right to assess the credibility of the witnesses and give weight to their testimony accordingly. However, unlike *Kelekolio*, where the jury was given an instruction indicating that it was entitled to assess the reliability and trustworthiness of Kelekolio's statement, there was no instruction in this case that even referred to Robinson's inculpatory statement. Nothing the court said informed the jury that it had the right to assess the credibility of Robinson's extrajudicial statement as well as that of her testimony.

Defendants are "entitled to an instruction on every defense or theory of defense having *any* support in the evidence, provided such evidence would support the consideration of that issue by the jury, no matter how weak, inconclusive or unsatisfac-

tory the evidence may be." *State v. Agrabante*, 73 Haw. 179, 196, 830 P.2d 492, 501 (1992) (emphasis in original and citation omitted). The crux of Robinson's defense was that her confession was unreliable and that she had engaged in no wrongdoing. She testified that the written statement was fabricated by the NIS investigators and that her signature on the statement was coerced by threats to take her son away from her. It was the jury's prerogative to give Robinson's testimony and confession the weight and effect it deemed them to be entitled. Therefore, on remand, Robinson is entitled to have the jury instructed that it may accord such weight and effect to her inculpatory statement as the jury feels it deserves under all the circumstances.

### C. Circuit Court's Failure to Instruct on Third Degree Assault

Robinson argues that the trial court committed reversible error when it refused to give the jury an instruction on the lesser included offense of assault in the third degree.[4] Pursuant to HRS § 701–109(5) (1993), if there is "a rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting him [or her] of the included offense," the court must charge the jury regarding the included offense. Our review of a defendant's entitlement to a lesser included offense instruction must be based on the evidence in the record on appeal. Because we have decided to remand this case for a new trial, a new and not necessarily identical record will be produced. Therefore, it would be futile to decide whether the court reversibly erred by failing to instruct the jury regarding assault in the third degree on the state of the present record. Nevertheless, we briefly address the issue to provide guidance on retrial.

Robinson initially argues that, "[a]lthough the record reflects that [the victim] had sustained 'serious bodily injuries' from November 13, 1991 to and including November 21, 1991, the record also reflects that he sustained 'bodily injury' during that same period." Robinson's argument reflects an apparent misunderstanding of the standard applicable to the issue of when the giving of an included offense instruction is required. If, for example, there were a rational basis in the evidence to conclude that the victim sustained bodily injury, but *not* serious bodily injury, then that evidence would support a verdict acquitting Robinson of assault in the first degree and convicting her of assault in the third degree and, thus, would require a jury instruction on assault in the third degree. Robinson, however, points to evidence that the victim suffered bodily injury *as well as* serious bodily injury. Although that evidence may provide a rational basis to support a verdict convicting her of assault in the third degree, it does not provide any basis for a verdict acquitting her of assault in the first degree.

Robinson also asserts that "[t]he jury could reject the argument that Ms. Robinson's conduct resulted in 'serious bodily injury' and find that her conduct resulted in only 'bodily injury,'" citing Dr. Bottini's testimony that it was improbable and likely impossible for the victim's injuries to have been caused by the child's head being struck against the shelf on the bookcase. Robinson, however, misstates the testimony and fails to recognize that the victim sustained more than one "serious bodily injury."

As previously stated, Dr. Bottini testified on direct examination that it was "more than improbable and perhaps impossible" for the victim's *skull fractures* to have been caused by having his head struck against the bookshelf. The skull fractures, however, were not the only serious bodily injuries sustained by the victim. "Serious bodily injury" is defined as "bodily injury which creates a substantial risk of death, or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." HRS § 707–700. It was

---

4. HRS § 707–712(1) (1993) provides in part that "[a] person commits the offense of assault in the third degree if the person: (a) [i]ntentionally, knowingly, or recklessly causes bodily injury to another person[.]" Robinson also requested that the jury be instructed on the definition of "bodily injury," which means "physical pain, illness, or any impairment of physical condition." HRS § 707–700 (1993).

undisputed at trial that the victim suffered retinal hemorrhaging, as a result of which he will have permanently and severely impaired vision in his right eye; clearly a "serious bodily injury." All three doctors involved in the diagnosis and treatment of the victim, Drs. Bottini, Yamaoka and Olson, testified that retinal hemorraghing is a symptom of shaken baby syndrome and can occur without impact or blunt trauma.

On retrial, Robinson will be entitled to have the jury instructed on the lesser included offense of assault in the third degree if there is a rational basis in the evidence adduced on retrial for a jury to acquit Robinson of assault in the first degree, *i.e.*, a rational basis to conclude that she did not cause the victim's skull fractures or retinal hemorrhaging and to convict her of assault in the third degree, *i.e.*, a rational basis to conclude that she caused only "bodily injury."

### D. *Mandatory Term of Imprisonment*

In her final argument, Robinson contends that the trial court erred by sentencing her to a mandatory term of imprisonment because the fact that the victim was a child under eight years of age was not determined by the jury. The prosecution relies on the rule established in *State v. Huelsman*, 60 Haw. 71, 588 P.2d 394 (1978), *reh'g denied*, 60 Haw. 308, 588 P.2d 407 (1979), that the determination that "the defendant is within the class of offenders to which the particular subsection [of the sentencing statute] applies" is made by the sentencing court, after the trier of fact has adjudicated the defendant's guilt. *Id.* at 76, 588 P.2d at 398; *accord State v. Schroeder*, 76 Hawai'i 517, 527, 880 P.2d 192, 202 (1994). Robinson argues that *Huelsman* applies only to "extended" sentences under HRS § 706–662, not to her "enhanced" mandatory minimum term of imprisonment pursuant to HRS § 706–660.2. She contends, instead, that this case is governed by the rule enunciated in *State v. Estrada*, 69 Haw. 204, 738 P.2d 812 (1987), that is, that "the aggravating circumstances [justifying the application of the enhanced sentencing statute] must be *alleged in the indictment and found by the jury* [.]" *Id.* at 230, 738 P.2d at 829 (emphasis in original)

(quoting *State v. Apao*, 59 Haw. 625, 635–36, 586 P.2d 250, 258 (1978)). We decline to adopt Robinson's reasoning because it is inconsistent with the statutory scheme.

This court has not deemed the characterization of a sentence as "extended" or "enhanced" determinative of the procedures required. In *Schroeder*, for example, we used the terms interchangably, explaining that

> [i]n short, the *Huelsman* rule is limited to **enhanced** sentencing, such as **extended** prison terms pursuant to HRS §§ 706–661, 706–662, and 706–664, in which the "determination that the defendant is a member of the class of offenders to which the particular [statute] applies involves historical facts." *Huelsman*, 60 Haw. at 79, 588 P.2d at 400. This is because such "historical facts" are **wholly** *extrinsic* to the specific circumstances of the defendant's offenses and therefore have no bearing on the issue of guilt *per se*.

76 Hawai'i at 528, 880 P.2d at 204 (underscored emphasis in original; boldface emphases added).

Moreover, an examination of the relevant statutes and the relationship between them persuades us that the *Huelsman* rule is applicable. *Huelsman* concerned the application of HRS § 706–662, which provides in pertinent part that:

> A convicted defendant may be subject to an extended term of imprisonment under section 706–661, if the convicted defendant satisfies one or more of the following criteria:
>
> . . . .
>
> (5) The defendant is an offender against the elder, handicapped, or minor under the age of eight whose imprisonment for an extended term is necessary for the protection of the public. The court shall not make such a finding unless:
>
> > (a) The defendant attempts or commits any of the following crimes: murder, a sexual offense which constitutes a felony under chapter 707, robbery, felonious assault, burglary, and kidnapping; and
> >
> > (b) The defendant, in the course of committing or attempting to commit the

crime, inflicts serious or substantial bodily injury upon a person who is:

(i) Sixty years of age or older;

(ii) Blind, a paraplegic, or a quadriplegic; or

(iii) Eight years of age or younger: and

(c) Such disability is known or reasonably should be known to the defendant.

In *Huelsman*, the court delineated the procedure required by HRS § 706–662:

Each of the subsections of HRS § 706–662 requires the trial court to engage in a two-step process to impose a sentence for an extended term. The first step involves a finding *by the court* that the defendant is within the class of offenders to which the particular subsection applies. Thus.... Subsection (5), added in 1978, similarly requires a finding that the defendant is an offender against the elderly or handicapped.... [5]

After the first step of this process has been completed and the defendant has been found *by the court* to be within the class of offenders specified by the particular subsection, the court must determine, under subsections (1), (2), (3) and (5), that the defendant's commitment for an extended term is necessary for the protection of the public.

*Huelsman*, 60 Haw. at 76–77, 588 P.2d at 398–400 (emphases added).

HRS § 706–660.2 (1993), pursuant to which Robinson was sentenced, provides in pertinent part that:

Notwithstanding section 706–669, a person who, in the course of committing or attempting to commit a felony, causes the death or inflicts serious or substantial bodily injury upon a person who is:

(1) Sixty years of age or older;

(2) Blind, a paraplegic, or a quadriplegic; or

(3) Eight years of age or younger;

and such disability is known or reasonably should be known to the defendant, shall, if not subjected to a mandatory term of imprisonment pursuant to section 706–662, be sentenced to a mandatory minimum term of imprisonment without possibility of parole as follows:

. . .

(3) For a class B felony—three years, four months[.]

Clearly, both sections 706–662(5) and 706–660.2 delineate, as an aggravating circumstance, infliction of serious or substantial bodily injuries to a victim who is: (1) sixty years of age or older; (2) blind, paraplegic, or quadraplegic; or (3) eight years of age or younger. Thus, both sections apply to the identical class of offenders. Construing the two provisions with reference to each other, as we must, *see, e.g., State v. Delima,* 78 Hawai'i 343, 347, 893 P.2d 194 (1995) (laws in *pari materia* are to be construed with reference to each other), subsections 706–662(5) and 706–660.2 delineate the two options available to the sentencing court once it has found that the defendant is within the class of offenders to which those subsections apply: (1) if the court thereafter finds that an extended term is necessary for the protection of the public, sentence is imposed pursuant to section 706–662(5); but (2) if the court thereafter finds that an extended term of imprisonment is *not* necessary for the protection of the public, it *must* impose a mandatory minimum term of imprisonment pursuant to HRS § 706–660.2.

Because, as previously stated, both sections 706–662(5) and 706–660.2 apply to the identical class of offenders, the court, in making its initial determination of whether Robinson is a member of the class, must necessarily find that the victim in this case was eight years of age or younger. Under Robinson's argument, however, once the court makes that initial determination and thereafter determines that an extended prison term is not necessary for the protection of the public, the identical fact of the victim's age cannot be relied upon by the court in impos-

---

**5.** Subsection (5) has subsequently been amended to encompass offenses against minors under the age of eight. HRS § 706–662(5) (Supp.1992).

ing a mandatory minimum term under HRS § 706–660.2 because, in Robinson's view, the victim's age must be determined by the trier of fact, at trial.

 As we stated in *Schroeder,* the determination of whether a defendant is a member of the class of offenders to which the particular statute applies "involves historical facts ... [that] are wholly *extrinsic* to the specific circumstances of the defendant's offenses[.]" *Schroeder,* 76 Hawaiʻi at 528, 880 P.2d at 204 (emphasis in original). Thus, the sentencing court's determination of the victim's age as an aggravating circumstance in this case was appropriate and was not required to have been made by the jury at trial. *Cf. Garringer v. State,* 80 Hawaiʻi 327, 334, 909 P.2d 1142, 1148 (1996) (citing *Schroeder,* 76 Hawaiʻi at 528, 880 P.2d at 203, as distinguishing the court's inherent power to make findings concerning "historical facts" under *Huelsman* from the rule under *Estrada* that where the aggravating circumstances required under an enhanced sentencing statute are intrinsic to the commission of the crime charged, they must be determined by the trier of fact). Consequently, we hold that the determination that a defendant is within the class of offenders to which HRS 706–660.2 applies shall be made by the sentencing court after the defendant's adjudication of guilt at trial by the trier of fact.

### III.  *CONCLUSION*

For the reasons stated above, we vacate Robinson's conviction of assault in the first degree and remand for a new trial consistent with this opinion.  On the briefs: